S. W. MARCH v. THE STATE.

1. CONSTITUTIONAL LAW—CONSTRUCTION.—When a discretion is confided to any one branch of the government, a decision by that department upon such matter cannot be questioned or revised.

2. SAME—CRIMINAL COURTS.—Under the constitutional provision that "the legislature may establish criminal courts in the principal cities within the State with such criminal jurisdiction, coextensive with the limits of the county wherein such cities may be situated, and under such regulations as may be prescribed by law," the legislature had the power to create a criminal court for the city of Tyler, in Smith county, with exclusive jurisdiction over felonies.

3. SAME.—The citizen has no vested right in any particular court in which to be tried for an offense or mode of procedure in such prosecution.

4. SAME.—All mere remedies are objects of legislative control, subject in criminal prosecutions that they be equally speedy, efficacious, public, and not more burdensome than those existing at the date of the commission of the alleged offense.

5. JURISDICTION OF CRIMINAL COURTS extended as well to cases removed by change of venue as those originating in the county over which such courts had jurisdiction.

6. MISCONDUCT OF JURY—CONVERSATIONS.—The ground for new trial " where a juror has conversed with any person in regard to the trial " cannot be held to exist unless such conversation was calculated to impress the case upon the mind of the juror in a different aspect from that made by the evidence, or calculated to result in harm to the party on trial.

7. SAME—USE OF INTOXICATING LIQUORS BY JURORS.—*Held,* That the introduction of four or five bottles of whisky into the jury-room and their use by the jurors, is such a use of intoxicating liquors as to vitiate a verdict found by such jury.

8. CONDUCT OF PROSECUTING OFFICERS CRITICISED.—Where, by the artifice of the prosecuting officers, a defendant has been induced to go to trial on the impression that important witnesses for the State were absent, when, in fact, they were present and concealed by the officers conducting the prosecution, and injury has arisen therefrom, a new trial should be granted.

APPEAL from Smith. Tried below before the Hon. J. L. Camp, judge of the Criminal District Court for the city of Tyler.

S. W. Marsh was indicted in the District Court of Rusk county for an assault on one Greenwood, in the town of Mount Enterprise, in said county, on the 23d day of October, A. D. 1871, with the intent to murder him, the said Greenwood. The venue of the suit was changed to the District Court of Smith county, and the case placed on the criminal docket of the District Court of said last mentioned county.

After remaining on the criminal docket of the District Court of Smith county several terms, and until after the creation of the criminal court for the city of Tyler, in Smith county, it, together with the other criminal cases on

the criminal docket of the District Court of Smith county, was transferred to the criminal court for the city of Tyler.

At the July term, 1875, of the criminal court, the case was called for trial.

The facts are substantially as follows: Barthold, a witness for the State, testified that he knew appellant, and Griffin, Gaddy, and Greenwood; that appellant and Griffin had a quarrel in the town of Mount Enterprise, in Rusk county, in the evening of the day on which the shooting took place, a few hours before the shooting occurred; that about dark, after witness had closed his business house and gone home, he heard the report of one or two firearms; looked out and saw two ladies going in the direction of appellant's store, whom he took to be appellant's wife and daughter; that he then heard the reports of a number of guns and pistols, but saw no one but a negro standing in front of appellant's store; that he did not know who did the shooting, but that next morning he saw a number of bullet holes in the front part of appellant's storehouse.

Ross, a witness for the State, testified that he lived in Mount Enterprise, Rusk county; was standing in the gallery of Norvell's store, in the month of October, 1871; heard loud talking; recognized the voice of appellant, and saw him walking in the direction of Griffin, Gaddy, and Greenwood, who were in the street at the time; that appellant approached near to where they were, and turned and walked in the direction of his store; that he then heard the report of two guns, and saw the blaze of the guns, but did not know who fired the shots; that there was then a good deal of shooting, but that he could not tell who shot, and that next morning he saw thirty or perhaps forty shot-holes in the front part of appellant's house.

Griffin, a witness for the State, testified that he lived three or four miles from Mount Enterprise; had a grocery store about fifty or seventy-five yards northeast from appellant's business house; was in Mount Enterprise in the

month of October, 1871, and that about dusk witness, Gaddy, and Greenwood were in the street preparing to go to a show; that appellant came up to them in an excited manner, and Greenwood asked him if he wanted to scare anybody or wanted a row with any one, and that appellant remarked, "come on and I will get you;" that appellant walked to his store, about thirty steps distant, and got his gun and fired at witness; that witness jumped behind a house that was near to him and at the same time heard the fire of another gun, but did not see at whom it was fired; that witness had a pistol and began to fire at appellant's house from behind the house where he was standing, and emptied his pistol in that direction; that he had no gun at the time, but went and got one immediately, and fired it also in the same direction; that neither Greenwood nor Gaddy was armed so far as witness knew; that they did not have guns or any weapons that were visible; that witness saw Greenwood and Gaddy after the firing was over, and that both of them were wounded; that Greenwood was shot in the thigh, and that he saw the wound and blood; that if any persons shot besides himself and appellant, as above stated, he did not see them; that witness and seven or eight other persons were going to a show that evening at Shiloh Church, about four miles distant; that he, Greenwood, and Gaddy were going after their horses and had bridles in their hands; that at the time of the shooting Gaddy and Greenwood were rather in front of appellant's house, about thirty steps distant therefrom; that witness did not know that there was a show that night, but understood from others that there was to be one; that he did not know what kind of a show it was; that he had no intention of attacking appellant then or at any other time; that the stable where they were going after their horses was east of witness's grocery, and that appellant's storehouse and residence are southwest from witness's grocery; that there was a trail leading directly from wit-

ness's grocery to the stable, and that witness and appellant had a quarrel two or three hours before the shooting about a bale of cotton.

Gaddy, a witness for the State, testified that he lived near Mount Enterprise, in Rusk county; that on the evening of the difficulty he was in the grocery store of the witness Griffin; that witness, Griffin, and Greenwood started to the stable to get their horses to go to the show; that when they got in about thirty yards of appellant's place of business appellant came meeting them in an angry manner, cursing, &c.; that Greenwood asked appellant if he wanted a row; that appellant replied, "come on and I will get you," and went in the direction of his store; that reaching the door he got a gun, pointed it in the direction of Griffin, and fired; that Griffin immediately got behind a house, and appellant immediately fired the other barrel of his gun at witness and Greenwood; that a shot struck witness on the thigh and he fell instantly, and looking around, saw Greenwood on the ground two or three steps from him; that Greenwood received a flesh wound in the thigh; that witness's skin was not broken by the shot that struck him, for the reason that it struck his knife in his pocket; that in about fifteen seconds after witness and Greenwood were shot several guns were fired—about twenty or thirty; that witness and seven or eight persons were going to the show that night, and that witness is now a minister of the Gospel, but was not at the time of the difficulty.

The jury found the defendant guilty, and assessed his punishment at two years in the penitentiary.

Appellant filed a motion for a new trial on the grounds of newly-discovered evidence, misconduct in the jury, that the verdict was contrary to the law and the evidence, and that appellant was decoyed into a trial in the absence of his witnesses by the trickery and artful management of the attorney assisting in the prosecution, and of the witnesses Griffin and Gaddy, and in consequence thereof did not have a fair and impartial trial.

The particular acts of misconduct in the jury relied on to obtain a new trial in the court below, are: That the jury, during their retirement, procured and drank four or five bottles of whisky, and that one of the jurors spoke to a person outside of the jury room, from a window, in reference to the case on which they were deliberating. In support of this ground of the motion, appellant read the affidavit of two of the jurors, the foreman, W. B. Butler, and Wilson Adams. They state that the jury drank four or five bottles of whisky during their deliberations on the case, and that it affected one of them so as to cause him to leap and dance about the room, and that some one from the outside spoke to one of the jurors, sitting in a window of the jury room, and asked him how long the jury would be out, and that the juror replied, during the year 1875, unless he got his verdict, which was for seven years' imprisonment in the penitentiary.

In support of the deposition of the two jurors, appellant read the deposition of Sam Taylor, who swore that he procured two bottles of whisky for one of the jurors of the name of Branch, in the day-time, and a bottle of whisky for another juror at night, that he was directed to have charged to the juror W. B. Butler. The district attorney read the depositions of nine of the jurors, in which they state they drank no whisky, nor saw any of the others drink any, and that neither one of them heard the conversation from the window of the jury room spoken of, nor know of any of the others hearing it.

The district attorney also read the affidavit of the officer in charge of the jury, which, in reference to the whisky drinking by the jury, and the conversation by the juror with a person outside the jury room, is, in substance, that if these things occurred he knew nothing of their occurrence, but thought he would have known of them if they had occurred. He also stated that he gave one of the jurors of the name of Weaver a drink of brandy, on his complaining of being unwell.

Appellant also read the affidavit of the district clerk Burns, and his deputy, Letchworth, to show that Berry Green, one of the jurors, told them after the trial that he had taken a drink of brandy whilst the jury were in the jury room deliberating on the case, and that the jury had played games of cards and other games, and had acted in a very disorderly manner whilst in the jury room.

The jurors Weaver and Green are among the nine jurors who swore they drank no whisky in the jury room, and saw none of the others do so.

The artifice complained of on part of the prosecution and relied on in motion for new trial is as follows: A. M. Murphey stated under oath that " on the morning of the day on which the trial of appellant was commenced he was at the railroad depot in the city of Tyler, where the train from Troupe stops; that he there met the assistant prosecuting attorney, and Barthold, Ross, Griffin, and Gaddy, the witnesses for the State in said case, all of whom had just arrived on the train; that affiant spoke to the assistant prosecuting attorney, with whom he was well acquainted, and that he immediately took affiant aside and asked him confidentially, impressing him with the fact that the inquiry was confidential, to inform him where appellant was stopping at in the city of Tyler; that witness informed him that he believed defendant was stopping at the Ferguson House, situated in the northwest corner of the public square of the city of Tyler; that affiant, said prosecuting attorney, and the said witnesses for the State walked in company toward the public square, affiant and said prosecuting attorney conversing about defendant's case, affiant saying to said attorney that defendant intended to try his case, and said attorney saying that he would not do so if he found out that the said four witnesses for the State were present; that when they arrived at the hotel kept by Mrs. Henry, on the southeast corner of the public square, between the Ferguson House and the depot, affiant came to

a halt, and said attorney asked him who kept that house, and that he replied, Mrs. Henry; that said attorney then requested said witnesses, Griffin and Gaddy, to go into Mrs. Henry's hotel and remain there, and not to be seen by defendant until the trial commenced, or until said attorney reported to them; that they, Griffin and Gaddy, went into Mrs. Henry's house, and affiant, said attorney, Barthold, and Ross walked on together in the direction of the Ferguson House until they arrived at the jewelry store of affiant on the public square, where affiant stopped, and said attorney, Barthold, and Ross went on to the Ferguson House, where defendant was stopping, and stopped there also, and that affiant was fully impressed by the manner and words of said attorney that his object was to conceal from defendant the fact of the presence of the witnesses, Griffin and Gaddy, and to induce him to believe that the witnesses, Barthold and Ross, were the only witnesses for the State present, for the purpose of decoying defendant into a trial, under a misapprehension of his situation."

From a statement of the district attorney on the record it appears that when appellant's case was first called, in the forenoon of the day on which the trial commenced, the State, represented at the time by the district attorney and the assistant prosecuting attorney, announced not ready for trial; that defendant's counsel insisted on a strict showing for a continuance, and that the court gave the State until two o'clock in the afternoon to prepare the showing, and that on the case being called again at two o'clock the State withdrew the application for continuance and announced ready for trial. The district attorney disclaimed knowledge of the facts alleged by defendant.

The record also contains the affidavit of Mrs. S. E. Marsh, wife of the accused, to very important facts in her knowledge. For want of her testimony defendant would not have gone to trial had he known of the presence of the witnesses Griffin and Gaddy.

The motions were overruled, and defendant appealed.

*Jones & Henry*, for appellant.

*A. J. Peeler, Assistant Attorney General,* for the State.

City criminal courts, being expressly authorized by the Constitution, (Art. V, sec. 1,) are not mere creatures of legislative enactment, nor are they inferior to the District Courts. Their jurisdiction is limited, in that they take cognizance of criminal cases only, but within the sphere of their jurisdiction they are of equal dignity with the District Courts.

Section 7 of Art. V, which declares, that the "District Court shall have original jurisdiction in all criminal cases," is to be construed in connection with section 1 of the same article, which provides for the establishment of criminal courts, with such jurisdiction " *as may be prescribed by law.*" If there were a conflict, the special provision should prevail over the general one. (Warren *v.* Shuman, 5 Tex., 441.) But there is none, for it is clear that the quantity of jurisdiction, whether exclusive or concurrent, is left entirely to legislative discretion. The only exclusive jurisdiction expressly vested by the Constitution in the District Courts is in relation to matters of probate. (Art. V, sec. 7.) Even magistrates, which are spoken of in the Constitution as inferior to the District Courts, may be given concurrent jurisdiction with them in cases of felony. (Johnson *v.* Happell, 4 Tex., 96; Clepper *v.* State, 4 Tex., 242; *Ex parte* McGrew, 40 Tex., 472.) The chief object in making the territorial jurisdiction of city criminal courts coextensive with the limits of the county, instead of the city, was to supersede the District Courts in the criminal business of the entire county. It was designed to relieve the District Court of criminal business, and enable it to give its whole time to civil matters. This is better attained by vesting exclusive jurisdiction, and avoiding the expense of

two courts for the same purpose, to say nothing of conflicts of jurisdiction which might arise. If, however, the District Court cannot be deprived of its whole criminal jurisdiction—this has not been done—it still has cognizance of misdemeanors, the criminal court, in this case, having exclusive jurisdiction of felonies only. As to such exclusive jurisdiction, if the Legislature could not confer this, the act would not divest it of all jurisdiction because unconstitutional in part. (Cooley's Const. Lim., sec. 177, *et seq.;* 33 Ind., 418.) But, whether exclusive or concurrent, the criminal court had the power to try this case. It was pending in the District Court at the time the criminal court was established, and was transferred in conformity to the 7th section of the act establishing it. There is no express requirement that the case shall originate in the county, and the inhibition, if it exist, is implied from the words " coextensive with the limits of the county." These refer to the territorial limits in which the criminal court is to exercise its jurisdiction, and not to the quantity or character of jurisdiction within such territory. They do not take away the power to try any particular character of case. The accused and his case, being within the jurisdiction of the criminal court, it was competent for the Legislature to direct him to be tried by said court, unless he had a vested constitutional right to be tried by the District Court exclusively. He had no such right. (Cooley's Const. Lim., secs. 272, 273, and notes; 1 Bish. Cr. Law, sec. 280; 1 Bish. Cr. Prac., sec. 115, note 3.) The venue in a criminal case may be changed after the offense is committed. (Gut *v.* The State, 9 Wall, 35; Lewis & Nelson's Appeal, 67 Pa. St., 153.)

There is nothing in the Constitution of this State guaranteeing a trial in any particular county, or in any particular court. The Constitution, Art. XII, sec. 10, provides: " The Legislature shall provide for a change of venue in civil and criminal cases." No particular court is here

mentioned, and upon what principle can it be contended, that in criminal cases, the most important of all, pending in criminal courts, the establishment of which is expressly provided for in the same instrument, the accused is to be denied the inestimable privilege of securing a fair trial?

In a cause pending in the criminal court of Smith county, the venue, except in the particular case mentioned in section 11 of the act, must be changed to some adjoining county, &c. Would it be unconstitutional to authorize such change, and shall all persons indicted in criminal courts be forced to trial in counties in which there may be prejudice against them? &c. The act establishing the criminal court (secs. 1 and 6) fully authorizes such change of venue by giving it all the powers possessed by the District Courts and judges, and by making applicable to it the Criminal Code and Code of Criminal Procedure. It is immaterial in this case, however, whether a change of venue could be made directly to the criminal court or not. The venue was changed to the District Court, and the case pending there some time before the case was transferred.

As sustaining my views on the validity of the transfer in this case I refer to Commonwealth *v.* Hipple, 69 Pa., 9; Price *v.* The State, 8 Gill, (Md.,) 295; Hopkins *v.* Com., 3 Met., (Mass.,) 460; Brien *v.* Com., 5 Id., 508; Webster *v.* Com., 5 Cush., 386; Thomas *v.* The State, 5 How., (Miss.,) 20. Whether the Legislature had the power arbitrarily to direct the transfer or not, it was made, and if it was competent for the criminal court at all to take cognizance of the case, its judgment is valid. It may be that the District Court could not have been compelled by *mandamus* or otherwise to relinquish its jurisdiction or control over the case, and yet, having done so, the transfer to and acquisition of jurisdiction by the criminal court is legal. Especially is this so when no objection was made and no plea to the jurisdiction interposed, as required by law. (Paschal's Dig., arts. 2951, 2952, 2953, 2966.) The exception

to the indictment was worthless, also the motion in arrest, unless the court was wholly without jurisdiction. Read, in connection with Paschal's Dig., art. 2966, 1 Bishop's Cr. Prac., sec. 123, as to waiver of right in pleading. As to the grounds for a new trial:

*Newly-discovered evidence:* Nearly five years had elapsed since indictment. During the whole time defendant has been out on recognizance. It is not stated that there is any probability of securing attendance of the witness. The evidence, if material, would only go to impeach the State's witnesses, and, if true, would not likely change the result. (Paschal's Dig., art. 1470, and note.)

*Conversing with juror:* The question asked and the answer of the juror cannot be tortured into the statutory ground of " conversing with any person in regard to the case." (Paschal's Dig., art. 3137.)

*Drinking liquor:* Even if the weight to which they are entitled be not given to the affidavits for the State, still it is not shown that any juror " became so intoxicated as to render it probable that his verdict was influenced thereby." (Paschal's Dig., art. 3137.)

*Separation of jury:* If the allegations on this point were true, it is not a statutory ground, nor is it shown that defendant has not received a fair trial. (Austin *v.* The State, 42 Tex., 355.)

*Trick by concealing presence of witnesses:* This is neither a statutory nor any other sort of ground. The defendant was out on recognizance, and, with his counsel, had every opportunity of learning whether the witnesses were present. He was anxious for a trial, and objected to a continuance by the State, except upon a strict showing, when he thought the State was unprepared. He does not state that he asked Mr. Bagley or either of the persons whom he knew to be witnesses and who were stopping at the same hotel with him, whether the other witnesses had arrived or not. He does not state that a single person ever told

him they were not present or that Murphey had or had not informed him of the interview with Mr. Bagley. He knew that the district attorney represented the State, and was the only one authorized by law to represent the State, (Paschal's Dig., art. 2496,) and yet he never approached him upon the subject. The statement of the district attorney shows that neither he nor Mr. Bagley sought improperly to decoy defendant into a trial. It was not their duty to defend, and especially were they justified in adopting such course as, without doing anything improper, would result in bringing to trial one who had been indicted for nearly five years. The district attorney may in some cases refuse to state who or where his witnesses are. Witnesses are sometimes killed and sometimes bribed. But concede that the defendant was misled upon the supposition that two of the witnesses were not present: his course was plain; he should have applied for a postponement or continuance. (Paschal's Dig., arts. 2983, 2993; Hartless *v.* The State, 32 Tex., 88; Yanez *v.* The State, 20 Tex., 656; Turner *v.* Morrison, 11 Cal., 21; Taylor *v.* Hurtan, 11 How. P. R., 283; Gilbert *v.* The State, 7 Humph., 524; Gra. & Wat., New Trial, 1 vol., 894, *et seq.*)

IRELAND, ASSOCIATE JUSTICE.—The appellant was indicted in the District Court of Rusk county, at the January term, 1872, for an assault on one Greenwood, with intent to kill and murder. In 1873 appellant made application for and obtained a change of venue to Smith county.

The record in the case was filed in the clerk's office of the District Court of Smith county in March, 1873, and the cause was placed on the docket of that court. The cause stood on the docket of that court until the 3d day of March, 1875, when the same was, under an order of the District Court, "transferred to the Criminal District Court in and for the city of Tyler, Smith county, Texas, in accordance with an act to establish a Criminal District

Court in and for the cities of Jefferson, in Marion county, Marshall, in Harrison county, Tyler, in Smith county, and Palestine, in Anderson county, and defining the powers thereof."

At the August term of the Criminal District Court of Smith county the appellant was tried, found guilty, and his punishment fixed at confinement in the penitentiary for two years. From this judgment the defendant has appealed to this court. The cause has been argued with unusual zeal and ability, both on the part of appellant and the State, and the importance of the questions involved has induced the court to give the case all the attention deemed necessary to a correct solution of the points involved.

It is claimed that the Criminal District Court had no power to try appellant, and we will first dispose of that question.

Article V, sec. 1, of the Constitution, says that " The judicial power of this State shall be vested in one Supreme Court, in District Courts, and in such inferior courts and magistrates as may be created by this Constitution or by the Legislature under its authority. The Legislature may establish criminal courts in the principal cities within the State, with such criminal jurisdiction, coextensive with the limits of the county wherein such city may be situated, and under such regulations as may be prescribed by law, and the judge thereof may preside over the courts of one or more cities, as the Legislature may direct."

On the 18th day of February, 1875, the Legislature passed an act creating the Criminal District Court for the city of Tyler and Smith county, and other cities and counties named in the act. (Gen. Laws, 1875, p. 45.) The first section of this act gives to the court created thereby original and exclusive jurisdiction in all felony cases and concurrent jurisdiction in misdemeanors, coextensive with the limits of the several counties where said courts may be

held.   The judges thereof are invested with all the powers of judges of the District Courts.

The same section provides that appeals from that court to the Supreme Court shall be had under the same rules and regulations as are now or may thereafter be provided by law for appeals from the District Courts.

The sixth section provides that trials and proceedings shall be conducted according to laws governing the rules of pleading, practice, and evidence in District Courts, and the regulations of the Penal Code and Code of Criminal Procedure, and all other laws with reference to criminal practice, fines, forfeitures, and to grand and petit jurors, shall be applicable to said court.

The seventh section provides that all criminal business pending in Smith and the other counties named shall be transferred to said criminal court at the first term thereof, and that after that date said criminal court shall have and exercise exclusive jurisdiction and control thereof the same as if originally instituted in said court.

The eighth section provides that the judge of said court may exchange or alternate with any district judge in criminal matters.

The ninth section provides that the clerks of the District Courts, where the criminal court may be held, and the district attorneys in such districts, shall be the clerks and district attorneys of the criminal courts.   The salary is the same as that of district judges.   The eleventh section provides for a change of venue to the District Court of the county, in case the judge is disqualified.

It is insisted that the act creating the criminal court is in violation of the first section of the fifth article of the Constitution, because it attempts to divest the District Court of its jurisdiction in criminal matters.

By reference to the article quoted, it will be seen that these criminal courts are to have such jurisdiction as may be provided by law, and in an effort to arrive at the cor-

rect meaning of an act of the Legislature, a constitution or an instrument of writing, it will not do to look at any particular clause, section or article, but the whole instrument or act must be consulted. (Cooley's Const. Limitations, 57; Sedg. on Const. and Stat. Law, 237, 238; 1 Binn. R., 601; Dwarris, 175–8.)

If that clause giving to the District Courts original jurisdiction in all criminal matters stood alone, there would be nothing to construe. It would speak for itself; but it must be construed in connection with the other provision, to wit: that these criminal courts are to have such jurisdiction within certain limits " as may be prescribed by law."

It must be borne in mind that the Constitution does not *proprio vigore*, create these criminal courts. It provided for their creation in case of necessity. It was necessary to create a tribunal with appropriate jurisdiction, and it was done in the creation of the District Courts.

It is believed that it would not be difficult to demonstrate that these criminal courts may be invested by the Legislature with exclusive jurisdiction in all criminal matters within their proper territorial limits, but as it is not necessary to a decision of this cause for us to decide that precise point, we leave it until it shall properly arise.

The precise question for our determination here is, did the Criminal District Court of Smith county have jurisdiction to try this case ?

It is a principle that has become axiomatic that, when a discretion is confided to any one branch of the government, a decision by that department upon that particular point cannot be questioned or revised.

" It follows, therefore," says Judge Cooley, " that every department of government and every official of every department may at any time, when a duty is to be performed, be required to pass upon a question of constitutional construction.

" Sometimes the decision when made must, from the

very nature of the case, be conclusive, and subject to no appeal or review however erroneous it may be in the opinion of other departments or officers.    *    *

" Under every constitution cases of this description are to be met with, and though it will sometimes be difficult to classify them, there can be no doubt, when the case is properly determined to be one of this character, that the rule must prevail which makes the decision final." (Cooley's Limitation, 40.)

These criminal courts are not inferior courts. They are in one aspect limited in jurisdiction. They are limited in that they take cognizance of criminal matters alone. They are, however, District Courts, qualified by the adjective "criminal," of equal dignity within their sphere with the District Courts. They derive their being from the same high source, the Constitution. Nor can it be said, because the act of the Legislature creating this court has declared that it should have exclusive jurisdiction in all felony cases, that this would divest it of all jurisdiction. A law is not necessarily void in all its parts because repugnant to the Constitution in some of its features. This is never the case unless the act would be inoperative without the objectionable part. (Commonwealth v. Clapp, 5 Ga., 100; Fisher v. McGirr, 1 Ga., 1; State v. Copeland, 3 R. I., 33; Armstrong v. Jackson, 1 Blackf., 374; Ely v. Thompson, 3 A. K. Marsh, 70; Hamilton v. Dudley, 2 Pet., 526.

The change of venue to Smith county was not sought on the ground of objection to the District Court in Rusk county, nor on account of any peculiar quality or mode of organization of the court in Smith county. It was a community tainted, as alleged, by combinations and prejudices, from which the defendant sought to free himself. He sought no particular court. It was a community in whose midst he could secure a fair and impartial trial that he asked for.

The mode of procedure, the structure of the courts, in

short, all mere remedies, are objects of legislative control, subject only to these limitations.

The new remedy, tribunal, or mode of procedure, must be equally speedy, efficacious, public, and not more burdensome than those existing at the date of the commission of the offense.

The citizen has no vested right in any particular court or mode of procedure. (Supervisors *v.* Briggs, 3 Denio, 173; 4 Wend., 210.)

On this subject Mr. Sedgwick says: " To deny to the Legislature power to make such changes as the social or political condition requires would reduce us to a state of Chinese stagnation and immobility, and would be absurdly inconsistent with the condition of our country and character of our people." (677.)

Judge Cooley says, (page 361–2:)

" The right to a particular remedy is not a vested right."

" As a general rule, every State has complete control over the remedies it affords to suitors in its courts. It may abolish one class of courts and create another."

This proposition, of course, must be understood with a due regard to the organic law.

It was the design of the Legislature to avoid if possible the necessity of organization of grand juries in the District Courts, where the criminal court is held. The jurisdiction of the District Courts in misdemeanors was not taken away because these could be prosecuted without indictment. It is contended that the words "coextensive with the limits of the county " preclude the idea that the criminal court could take cognizance of a cause, where the offense was committed in another county, even by change of venue. The principal cities were the communities to be provided for, and in order to avoid misconstruction and give them the same jurisdiction exercised by the District Court, so far as territory is concerned, the words quoted above were added.

This is but an embodiment of the common law, for by that law a party was entitled to a trial in the county where it was alleged he had committed the offense. (Story on the Const., § 1781.)

While that is the common law and is to be found in many of the Constitutions of the States, it has never been doubted that it was competent for the Legislature to provide for a change of venue. (1 Bish. Cr. Pro., § 50.) But to give the words alluded to the construction contended for would cut off the right to a change of venue.

We cannot believe that it was the intention of the framers of the Constitution to give to those words the construction contended for by appellant's counsel, and without extending these remarks on that branch of the case, we hold that the Criminal District Court for the city of Tyler and Smith county had jurisdiction of this case, and was competent to try the defendant.

It is insisted that one of the jurors had a conversation with a man after the jury had the case submitted to it, and for that the new trial should have been granted. (Paschal's Dig., art. 3137.)

We are not prepared to say that the remarks that passed between one of the jurors and a man at Thompson's beef market was such a conversation as was in the minds of the Legislature when that act was passed.

It is believed that the conversation alluded to in the law must be a conversation calculated to impress the case under consideration upon the minds of the juror in a different aspect from the one made upon the mind from hearing the evidence in the court room, or of such a nature as calculated to result in harm to the party on trial.

The conduct of the prosecution is complained of. The law officer of the Government has, by an affidavit, exculpated himself from blame in that matter, and it is possible that those assisting in the prosecution may also be able to free themselves from blame, but their exculpation is not to be found in this record.

This is not made a ground for a new trial, and we are not prepared to say, in view of the fact that no postponement of the trial was asked when the two last witnesses made their appearance, that the judgment should be reversed on that ground, and we will content ourselves on this point by quoting from the Supreme Court of Tennessee in the case of Curtis *v.* The State, (6 Cold. R., 9,) to be found in Cooley's Const. Limitations, (31, note.)

" It is the duty of the presiding officer to treat the accused with judicial fairness, and to inflict injury at the expense of justice is no part of the purpose for which he is chosen."

" Unfortunately, however, we sometimes meet with cases in which these officers appear to regard themselves as counsel for the complaining party rather than the impartial representative of public justice."

" But we trust it is not often that cases occur like a recent one in Tennessee, in which the Supreme Court felt called upon to set aside a verdict in a criminal case, where, by the artifice of the prosecuting officer, the prisoner had been induced to go to trial under the belief that certain witnesses for the State were absent when in fact they were present and kept in concealment by this functionary."

One of the grounds insisted upon for a reversal yet remains to be noticed, the improper use of intoxicating liquors by the jurors. The last cause for which a new trial may be granted, set forth in the 7th subdivision, Paschal's Dig., art. 3137, is: " Or where any juror at any time during the trial, or after returning, may have become so intoxicated as to render it probable his verdict was influenced thereby." "But the mere drinking of liquor by a juror shall not be sufficient grounds for granting a new trial."

The code was adopted after the decision of this court in Jones & Jones *v.* The State, 13 Tex., 168.

That case reviewed the rule in some of the States on this subject, and the court finally adopted the rule laid down

in Douglass *v.* The People, in New York, although that case had been overruled. Without undertaking to lay down any rule on this subject for the guidance of future cases, we believe that the record in this case shows such an excess in the use of liquor that it calls for a reversal of the judgment.

It would be difficult to say how much liquor a juror could drink without its influencing his verdict. While strong drink will make some persons gentle, even amiable and charitable, in others it arouses the worst passions of the human soul, rendering the whole mind a cauldron, regardless of human suffering and life, bent only upon destruction, regarding neither friends, the partner of the bosom, nor his tender offspring.

It is pretty clearly established that there were four or five bottles of liquor taken to the jury-room during the deliberations in this case. The affidavit of the nine jurors cannot be regarded as disproving this fact, and their affidavit may fairly be taken as strengthening the idea that liquor was used to excess. If those nine knew nothing of it, it is·the more probable that the others had more than is compatible with a correct administration of the law, and this may account for the jurors leaping and dancing. In order that we may not be misunderstood, we say that the conduct of the bailiff in charge of the jury in not reporting these irregularities to the court, the conduct of the jury in drinking and separating, and in listening and replying to remarks of a citizen, deserved condemnation and punishment at the hands of the court below; and we hold that the excessive use of intoxicating liquors by the jurors entitled the defendant to a new trial, and because of the refusal of the court to grant it the judgment is reversed and the case remanded.

REVERSED AND REMANDED.