26   689
28   121
28   244
28   414
26   689
30    54
31   403
26   689
34   250
26   689
37   589
37   609

TYLER TERM, 1886.

No. 2266.

C. W. BOYETT *v.* THE STATE.

1. PRACTICE—CHANGE OF VENUE.—In changing the venue of his own motion the district judge is authorized to transfer the case to any county in his own or in an adjoining district.

2. CONTINUANCE—NEW TRIAL.—The absence of testimony which, though competent, could not have affected the result of the trial, is not ground either for continuance or new trial.

44

3. JURY LAW.—Separation of the jury by permission of the court over de-fendant's objection will necessitate reversal of a conviction without reference to the question of injury to defendant. But to reverse be-cause the jury separated without the consent of the court, it must ap-pear that the separating juror conversed with other persons about the case or committed other misconduct to the prejudice of the accused. It is complained in this case that a juror, with consent of counsel on both sides, was permitted by the court to visit his sick wife in charge of an officer; but it appears that he did not converse with her or any one about the case. *Held*, that the objection is without merit.

4. CONFESSION.—To the competency as evidence of the defendant's cer-tain statements it was objected that he was in custody when he made them, and that he was not cautioned that they might be used against him. But it appears that the defendant, when he made the state-ments, was confined merely as a sequestered witness, and that, al-though he was suspected of complicity in the offense, he was not shown to be aware of the suspicion against him. *Held* not to consti-tute the custody contemplated by the rule invoked.

5. JURY LAW.—Upon the return of the verdict the jury was discharged but almost immediately, and before all the jurors had left the box, the verdict was found to be informal, and the jury was replaced in the box and the verdict amended. *Held* that no injury resulted to the defend-ant from this proceeding, and he has no cause to complain.

APPEAL from the District Court of Taylor, on change of venue from Nolan. Tried below before the Hon. William Kennedy.

The conviction in this case was in the first degree for the murder of Ben Warren, in Nolan county, Texas, on the tenth day of February, 1885. The penalty assessed was a life term in the penitentiary.

Beginning on page 17 of the nineteenth volume of these Reports will be found a full report of the proceedings had upon the habeas corpus trial, under the appellant's application for bail. Inasmuch, however, as the evidence adduced upon this trial is much more comprehensive, a re statement of the case is set out below.

T. L. Odom was the first witness for the State. He testified that he had known the defendant about seven years and formed the acquaintance of Ben Warren something more than a year previous to his decease. The witness was present and witnessed the death of Warren, which occurred in the office of the Cen-tral hotel in Sweetwater, Nolan county, Texas, on the night of February 10, 1885. A gun shot fired into the office from the out-side, through one of the windows, was the cause of Warren's death. At the time that the shot was fired the witness and a

number of other persons were in the said office, sitting around the stove and talking. Warren, with his hands in his overcoat pockets, was smoking a pipe, and was sitting in a chair to the right and a little behind the witness. The ball fired from the outside, and which killed Warren, came through the north window, breaking the pane about one inch from the sash railing on the left hand side of the window. The witness, at the time the fatal shot was fired, was on an almost direct line between Warren and the window. The ball passed through the window between four and five feet from the ground and lodged in the south wall about three and a half feet from its junction with the east wall, and about the same distance above the office floor. It struck the window pane at an angle of about forty-five degrees, passed through Warren's head, entering just below the left eye, and making its exit behind and below the right ear. At the report of the discharge the witness sprang from his chair and passed rapidly into the hotel dining room, which adjoined the office. Witness did not discover that the ball struck Mr. Warren until, a few minutes after the shot was fired, he opened the dining room door and looked into the office. The witness was unable to state on which side of him the ball passed, but distinctly felt the concussion it made in the air on its passage. A man who was engaged in the business of poisoning prairie dogs was seated in the office near the window through which the shot was fired. Two other men were seated at the east side of the room, facing the witness.

The north wall of the hotel building rested on an alley between twenty and thirty feet wide, which alley extended the whole length of the building. A plank fence between two and three feet high ran along the alley, about two feet from the building, paralleling the said building throughout its entire length. Early on the morning after the assassination the witness went to the point in the said alley just opposite the window through which the fatal shot was fired, for the purpose of examining the ground. On the outside of the fence, and near the said window, the witness saw the track of a man's shoe. According to the best of the witness's recollection, the toe of the right foot track was against the fence. Witness, in his time, had been quite a hunter for sport, and had used a gun since he was eight years old. He always shot a gun from the left shoulder. Standing with his feet in the tracks at the fence, he observed that the hole made in the pane of glass by the fatal

ball was about on a level with his left shoulder.    The witness thought that a man standing at the window, and looking though the bullet hole in the pane of glass, could see the spot in the south wall where the fatal ball was imbedded after passing through Warren's head.    The positions occupied by witness and Warren when the fatal shot was fired were on a direct line between the hole in the window pane and the hole in the south wall.    The tracks under the window were within eight inches of the same line,—west of it.  As near as the witness could estimate, the fatal shot was fired between half past nine and ten o'clock. Witness passed into the dining room immediately after the shot was fired.    He remained in that room between five and seven minutes.    The first time he opened the dining room door he saw some of the persons he left in the office. ˙ The second time he opened the door 'he saw Warren lying on the floor, and recognized a man who was standing over him, lo king down into his face, as Mack Boyett, a brother of the defendant. Witness then left the Central hotel through the kitchen and back yard, and went to the Palace hotel, which he entered by the front door.    He remained in the Palace hotel about five minutes, meeting Major A. W. Hilliard and Mr. Spoonts, who appeared to have heard of the assassination.    About the time he left the Palace hotel he met Mr. Fred A. Beall, who offered him protection.    After talking with Beall about five minutes, the witness went with the hotel porter to the room assigned him.    He then looked at his watch, and, according to his recollection, found the time to be about ten o'clock.

Warren's business in Sweetwater at the time of his assassination was to attend court in answer to a charge of maliciously shooting Bunton's cow.    His trial, which was had on the day of his death, resulted in a hung jury.  Warren was represented on that trial by M. A. Spoonts, but had no witnesses.  W. J. Wood, another defendant in this case, and Riley Hylton and Dow Hylton were State's witnesses.    The witness knew that hard feelings existed between Warren and defendant at the time of the assassination.    Warren had been in the military service of the State, and was detailed to "work up" some fence cutting cases.    At the May term, 1884, of the Runnels county district court, indictments for fence cutting were returned against the defendant and Mack Boyett, Dow Hylton, W. R. Hylton, James Yardley, Bill Yardley, Tom Franks, N. M. Franks, Frank Perry, George Sutton, John Ford, and about

fifteen other persons, in all of which cases the deceased and one Carlton were the principal State's witnesses. Mr. Tormey came to the witness while he was in the dining room, just after the fatal shot was fired, and witness asked him what he should do, and Tormey told him to hide in a dark place. Witness, who thought that he saw the flash of a light on the dining room window, replied that he was afraid of being killed. Defendant and Warren lived at one time in the same neighborhood on Fish creek, but at the time of the killing Warren was living on witness's place at Fort Chadbourne, in Runnels county, which was about thirty miles from defendant's place on Fish Creek.

Cross examined, the witness said that he did not know when nor by whom the track under the window was made. He did not see it until very early on the morning after the assassination. For all that the witness knew to the contrary, a dozen men may have visited the alley on that morning before he did. Witness thought that Tormey came into the dining room, where he was just after the shooting, from a room on the east side of the building. No person was in the alley when witness visited it on the morning after the murder.

A. A. Hanscomb testified, for the State, that he was the foreman of the grand jury at the May term, 1884, of the Runnels county district court. This defendant and Mack Boyett, W. J. Wood, George Sutton, Jim Yardley and others, aggregating sixteen in number, were indicted by that grand jury for fence cutting, and the deceased was one of the main witnesses upon whose testimony the indictments were found. Horace Thompson, another member of the said grand jury, testified for the State substantially as did Hanscomb, and in addition that Warren's testimony was more direct and positive against this defendant and W. J. Wood than against any other of the parties indicted. At this point the State introduced a number of indictments for cutting the fence of T. L. Odom, which included as many as three against the defendant, W. J. Wood, and Riley and Dow Hylton, upon all of which the name of the deceased was indorsed as a State's witness.

J. E. Warren, a brother of the deceased, was the next witness for the State. He testified that he knew as a fact that, at the time of the assassination of the deceased, hard feelings existed between the deceased and this defendant and W. J. Wood, who was a brother-in-law of the witness. That hard feeling was the

result of Ben Warren's connection with certain indictments against defendant and Wood and other parties for fence cutting. The witness had heard this defendant utter threats to kill Ben Warren. In the summer of 1884 defendant told this witness that he, defendant, and his brother-in-law, Pete Thompson, under the impression but not sure that Ben Warren was a witness against them for fence cutting, once waylaid him on his way home from Sweetwater with intent to kill him, but that when Ben met and spoke to them in a friendly manner, and so differently than they expected, they concluded that he was not a witness against them and abandoned their purpose to kill him; that, as Thompson had not then been arrested upon the indictment against him, and was therefore afraid to tarry on the public road, they requested him (Ben Warren) to go with them into a neighboring hollow for the purpose of having a private talk, and that his readiness to go, and his manner and deportment after they got there, convinced him and Thompson that they were mistaken in supposing that Warren was a witness against them. Defendant then asked the witness to ascertain for him whether or not deceased was a witness for the prosecution in the several cases, explaining that, if he was, he, defendant, would make an effort to get Warren to leave the country. W. R. Hylton, Dow Hylton and W. J. Wood were witnesses against Ben Warren in the county court of Nolan county for the shooting of Bunton's cow. The witness was at the house of Wilson Hunt, a few hundred yards south of Sweetwater, on the night and at the time of the killing of Ben Warren. W. J. Wood came to Hunt's house on that night and told the witness of the killing. On the next morning the witness came to town and caught sight of the defendant, who turned off and avoided witness. Up to that time the witness and defendant had been on good terms.

Upon his cross examination, the witness stated that he had testified as often as six different times in this case, but had never before testified about the conversation with defendant in which he threatened to take the life of Ben Warren, because as often as the prosecuting counsel attempted to bring out that fact the counsel for the defense objected, and the trial court sustained the objection. Witness admitted that, pending one of the habeas corpus trials in this case, he stated this fact to the district and county attorneys, but told them not to question him on that point, because he would feel constrained to swear to a

lie about it, inasmuch as he then lived on Fish creek, in the neighborhood of the defendant, and was afraid to tell the truth about it.

W. C. Keith was the next witness for the State. In reply to close and searching inquiry, he declared that he was unable to remember whether or not, in a conversation in his field, a few months subsequent to the filing of the indictments in the fence cutting cases, the defendant told him that the deceased would or ought to be killed. The record of his testimony upon the habeas corpus trial showed that he so testified at that time, and, in reply to further questions, he stated that his testimony upon the habeas corpus trial was true.

Joseph Boon was introduced by the State to fix the time of the shooting. He stated that he left his house at exactly half past nine to go to the railroad depot, and had walked about one hundred and twenty-five yards when the shot was fired. Between four and five o'clock on that evening the witness saw the defendant and W. J. Wood together and in conversation on the street. He heard nothing they said, nor did he at the time observe anything peculiar about their deportment.

M. A. Spoonts testified, for the State, that he was in Sweet-water on the fatal day, to represent Odom & Co. and Ben Warren, in a case pending in the court. The defendant and W. J. Wood were witnesses against Warren for killing Bunton's cow.

J. A. Durham testified, for the State, that he saw the defendant and W. J. Wood, Mack Boyett, W. R. Hylton and Ben Warren in Bennett's saloon between nine and ten o'clock on the fatal night. The defendant was standing either just inside or just outside of Bennett's door when witness left, but, with the other parties, left that saloon almost immediately. Witness understood that defendant and Wood, when they left Bennett's saloon, were going to the house of a friend in the southern part of town to stay all night. Afterwards, but witness could not ay how long, he heard the fatal shot.

J. T. Moore testified, for the State, that he met the defendant and W. J. Wood and others in Bennett's saloon at about nine o'clock of the fatal night, and loaned his black overcoat to the said Wood.

J. H. Bennett testified, for the State, that he went home from his saloon between seven and eight o'clock on the fatal night. He sat up about forty-five minutes after he got home, and

heard the shot soon after he went to bed.   Guessing at the time, he would say that it was about nine o'clock when the shot was fired.   In going home—his house being situated about one hundred yards from the Central hotel—the witness passed through the alley north of the Central hotel.   He saw no person in the alley, but, when he reached a point in it about one hundred and forty feet from the northeast corner of the hotel, he heard footsteps of some kind, striking against tin cans.   He concluded that the object walking was a horse.

P. G. Bradley testified, for the State, that between sun down and dark on the fatal day he saw two men in close conversation behind Bennett's saloon.   Each of the men had a gun and wore, to the best of witness's recollection, light colored overcoats.   Witness did not recognize them, but they resembled the defendant and Wood.

Ed Tormey testified, for the State, that on the fatal night he occupied the room in the south side or end of the Central hotel, and just after the fatal shot was fired had occasion to step off the front gallery of that hotel.   Just as he stepped off the said gallery he saw a man with an overcoat across his arm, hurrying from the office.   At about the same time he saw a medium sized man, whom he did not positively recognize, standing near the northeast corner of the said hotel.   That man was in the act of putting a pistol in a scabbard at his side.   That man had on a dark overcoat.   Witness then went into the office of the hotel and found Warren in a chair, dead, his head thrown back and his arms hanging down.   He helped place the body in a recumbent position on the floor, and passed into the dining room, where he found Colonel T. L. Odom, whom he told to hide under a table or in a dark corner to avoid being shot.   He based this advice upon apprehensions superinduced by a flash of light on one of the dining room windows.   Just after that flash the witness saw a man with a pistol in his hand, going out of the alley, west.   That man wore a mustache, and was unknown to witness.   The witness denied that he ever told W. A. Gray or Mr. Thurmond that he knew that man.

A. W. Hilliard testified, for the State, that when the fatal shot was fired he was sitting in his room in the Palace hotel, the back yard of which adjoined the back yard of the Central hotel.   The shot was fired from a rifle.   Soon after the report the witness heard the footsteps of human beings fleeing rapidly past the Palace hotel, towards the railroad.

Mrs. J. H. Beall testified, for the State, that she lived with her husband in the suburbs of the town of Sweetwater. Mrs. O. B. Seitz was at witness's house on the night of the killing. At about forty minutes past nine o'clock on that night two men came to witness's house and called from the gate. Witness asked who was there. One of them replied by asking if Mr. Beall was at home. Witness replied that he was not, and again asked who the parties were. One of them replied "Boyett," and remarked that they wanted to see Mr. Beall about paying some taxes, and wanted to stay over night. Witness replied that she could not give them quarters for the night, but invited them in to await the return of Mr. Beall. One of the men put a short barreled gun against the fence, and the two came in and were recognized by the witness as the defendant and W. J. Wood. Both were drinking, defendant particularly being under the influence of liquor. As they stepped into the house defendant said to witness, "don't you say anything about us being here to night." They said nothing about anybody being killed in town, but spoke of the Odom cases which were to be tried on the next day. At intervals they spoke to each other in whispers. Defendant appeared to be excited, nervous and uneasy. Wood was quite calm and composed, but his face was very pale. They remained at witness's house until Mr. Beall, accompanied by Mr. O. B. Seitz and Mr. Wise, came home, which was about an hour after they got to the house. Fifteen minutes later they left. Mr. Seitz corroborated this witness in every particular.

J. H. Beall, tax assessor of Nolan county, testified for the State, that he was in his office in the court house in Sweetwater at the time that the fatal shot was fired. Accompanied by Mr. O. B. Seitz and Professor Wise, he went home about eleven o'clock. He found the defendant and W. J. Wood at his house. Defendant, when witness first saw him, was standing in the yard between the front door of the house and the gate. He followed the witness into the house, and was soon joined by W. J. Wood. In the course of a general conversation that ensued defendant said something about the condition of the Fish creek road, and something about taxes. Witness had occasionally received taxes at his house for the collector, but never at night. Defendant was in witness's office during the day, but said nothing about taxes. Witness remarked to defendant and Wood that he was sorry that he was too crowded to invite them to

stay all night. They replied that it made no difference; that they had merely called to chat awhile, as nothing was going on in town. Defendant then remarked something about a shot or shots having been fired in town. Witness replied that he heard no shooting, and asked defendant if Ben Warren was mixed up in it. He replied that he thought he was, and that "it was a center shot if the ball did not glance." Witness then told him that, if Warren was shot, he, defendant, and Wood would be accused of the shooting. Defendant replied that he would be willing to go direct to hell if he knew that Warren was dead. Either he or Wood, as they left witness's house, remarked that they had started out to see Jim Warren, but, becoming afraid they would run on somebody, turned into witness's house, and requested witness to answer, if questioned, that they were at his house on that night. When witness saw defendant and Wood on the next morning he observed they looked excited and uneasy.

C. H. Boyett, the father of the defendant, was the next witness for the State. He testified that he separated from the defendant just after nine o'clock on that fatal night, at Johnson's saloon. Defendant and Wood left together, saying that they were going to Beall's house, or Eidson's house, to pass the night. Witness last saw them near a shoe shop, going towards Beall's house. Witness then went to Thurmond's house, where he spent the night. While at that house he heard the fatal shot, but was not informed of Warren's death until next morning. Defendant came to Thurmond's house during breakfast on the next morning, and said to witness: "Pap, the very devil is to pay!" Witness asked him what was the matter, and he replied: "Ben Warren is killed." Witness said: "Neill, you don't tell me so!" He replied: "Yes, Pap, it is so." Witness then asked if he had any idea who killed him. He replied: "No, Pap, I have not, but you know it will be laid on me, and with my surroundings I will have to bear it." Defendant was left handed as a general thing, but used a hoe and ax right handed. Witness did not know whether defendant used fire arms from his right or left shoulder.

Fred A. Beall testified for the State, that he was playing billiards in Johnson's saloon when the fatal shot was fired. R. B. Foster, H. H. Williams, Mack Boyett, Riley Hylton, and perhaps others, were also in the saloon at the time. About the time the shot was fired, H. H. Williams asked witness the time

of night, which witness, consulting his watch, found to be twenty minutes before ten o'clock. A few minutes later a man ran into the saloon and reported that a man had been killed at the Central hotel. Witness then sent Williams to the court house to notify Sheriff Bardwell. Five or ten minutes later he and others repaired to the Central hotel. Witness saw defendant and Wood during the day of the killing. Defendant had a nickel plated pistol which, having been recently repaired, he left behind the bar in Bennett's saloon. Wood was then wearing a small black mustache.

John C. Cox, district clerk of Nolan county, testified, for the State, that he met defendant and W. J. Wood on the stairway of the court house in Sweetwater, about eight o'clock on the morning of the killing. He observed nothing unusual in the appearance of either of them. Defendant inquired for County Attorney Scarborough, but did not say what he wanted with him.

The State next read in evidence the statement of the defendant as made by him at the inquest upon Warren's body. It was in substance to the effect that he, Mack Boyett, Riley Hylton, Wood and others ate supper together at the restaurant in Sweetwater, about dark on the fatal evening. After supper, accompanied by Wood and perhaps some of the other parties named, he visited Bennett's and Johnson's saloons. Witness could not say which of the saloons he visited first. He did not know how long it was before the killing that he met Jim Durham at the saloon. He did not know when the fatal shot was fired, nor did he recollect hearing a shot on that night. He was doubtless on his way to Mr. Beall's house when the shot was fired. In going to Beall's house he went by way of the opera house and the railroad depot. Beall was not at home when he and Wood reached the house, but came an hour later, after which the witness (now the defendant) and Wood remained about an hour. Witness took his forty-four calibre Winchester gun with him to Beall's, and took it away with him and left it at Eidson's house, where he spent the night. Wood had no gun, but probably had the nickel plated pistol referred to by the witness Fred A. Beall, which belonged to him, Wood. Witness got that pistol at Eidson's office and gave it to Wood. He gave Beall a "stiff" in telling him that he had gotten the pistol from the gun shop. From Beall's house witness and Wood returned to the restaurant. Riley Hylton was then in bed, but got up

when Sheriff Bardwell came in to get somebody to sit up with the corpse. Witness and Riley Hylton then went to Eidson's house and went to bed. Wood went to Hunt's house to notify Jim Warren of the death of his brother. Hard feeling existed between witness, Mack Boyett and Riley and Dan Hylton, on the one side, and Ben Warren on the other, the reason of which was that Ben Warren was a paid and hired witness against them. Witness had heard a number of men, including Pete Thompson, George Sutton and Bill Yardley, utter threats to kill Ben Warren. He had often heard others declare their intention to embrace the first opportunity to kill deceased, but he declined to give any more names. The witness denied that either he or Wood said anything to Mrs. Beall about telling that they were at Beall's house on that night. Nothing was said at Beall's house on that night about the Odom cases that were to be tried on the next day.

Sheriff Bardwell testified, for the State, that he reached the Central hotel about seventeen minutes after Deputy Sheriff Williams waked him up and informed him of the killing of Ben Warren. Upon reaching the hotel he looked at his watch and found that it was then either seven or nine minutes before or after ten o'clock. His best recollection was that it was before ten o'clock. His watch was running on railroad time.

The State closed.

W. C. Johnson testified, for the defense, that he left his saloon to go home about nine o'clock on the fatal night. C. H. Boyett, the defendant's father, and the defendant and others left the saloon at about the same time. Witness did not observe which way they went. Soon after he got home, and while he was reading a newspaper, he heard the fatal shot. He could not be positive about the time, but it was his best impression that it was about half past nine when the shot was fired. Witness stated another and later hour on the former trial, but upon reflection thought his present statement was correct.

L. F. Otey testified, for the defense, that he left the restaurant, fifty yards distant from the Central hotel, to go home, at about half past nine o'clock on the fatal night. He passed through the alley north of the hotel. He observed that the hotel office was lighted up, but did not look in. Witness reached his home in a very few minutes, and had just sat down when the fatal shot was fired. His wife was then in the act of winding up the clock, but witness took no note of the time.

Mrs. Otey testified, for the defense, that she was winding the clock when the fatal shot was fired, and that it was then ten minutes before ten o'clock—a fact which she observed in remarking that Mr. Otey got home a little later than usual on that night.

Wilson Hunt testified, for the defense, that he lived in Sweetwater, about four hundred yards from the Central hotel, and was at home on the night that Warren was killed. About ten o'clock that night a horse running at full speed and going south passed the witness's house, and maintained that speed as long as witness could hear him. Witness was an experienced horseman and knew, from the sound of the hoof beats, that the horse was ridden by somebody.

W. M. McDonald testified, for the defense, that he left the Central hotel, on the night of the murder, at half past nine o'clock by T. L. Odom's time. From that hotel he went to Bennett's saloon, where he met the defendant, Mack Boyett, Durham, Wood, and perhaps others. Mack Boyett asked witness where he expected to find quarters for the night. Witness replied that he was going to sleep in the opera house. Some of the parties then asked if they could get accommodation at the same place. Witness replied that if any of the parties who went to Colorado City on that day had left their blankets, he could let them have some bedding. Something was then said to defendant and Wood about where they would sleep, and one or the other mentioned the private residence of a citizen in the southern portion of town. Witness did not recollect the name of the citizen mentioned by them. Defendant and Wood then left the saloon together, passing out of the front door. Mack Boyett then remarked: "Riley Hylton is at Johnson's saloon. I will go and get him and then go to the opera house to bunk." Witness went to the opera house immediately after this conversation. When he reached a point near the railroad crossing, immediately opposite the opera house, he saw two men walking in front of him, going in the direction in which he was traveling—towards the opera house. Witness did not recognize them by sight, but by their voices recognized them as the defendant and W. J. Wood. Wood said to defendant: "Neill, I don't see how the jury could acquit Ben Warren when Riley Hylton and I both swore positively that we saw him shoot the cow." The defendant replied: "No, I don't either, but they didn't convict him." Witness followed them until he got across

the railroad track, when he turned into the opera house, and defendant and Wood went on in a southeast direction, and witness did not see them again on that night. Riley Hylton and Mack Boyett did not come to the opera house, as witness expected they would. Wood put on his overcoat when he left the saloon just before witness did. He then had no weapon on his person that the witness saw, and witness was satisfied that he would have seen a pistol if Wood then had one on his person.

Cross examined, the witness stated that, aware of the hard feeling existing between Ben Warren on the one side, and defendant and Wood and the other parties indicted for fence cutting, on the other, he was not surprised when he heard of the killing of Warren. The manner of the killing, and especially that it was done in Sweetwater, did surprise him. Witness did not hear of the killing until next morning. He did not hear the fatal shot when it was fired. He at that time was in the opera house, listening to the band, and the music no doubt prevented him from hearing the shot. Witness denied that on the morning after the homicide he remarked to Colonel Odom that he told Warren on the day before that "some of that outfit would kill him." When he met Colonel Odom on the next morning he remarked to him: "Colonel, I understand that Ben Warren was killed last night." Colonel Odom replied: "Yes, Ben is a corpse." Witness then said: "That is bad. How long after I left the Central hotel did the killing occur?" Colonel Odom replied: "About twenty minutes." Witness left the hotel about nine o'clock. Witness testified before the coroner's jury about this case, and also on the trial of Wood in the Nolan county district court. In stating before the coroner's jury, as appears in his written testimony, that he saw none of the parties he had recently seen in Bennett's saloon, after he left that saloon, he meant that he did not afterwards see Mack Boyett and Riley Hylton. He understood the question to which that statement was in reply to refer to Hylton and Mack Boyett, and did not understand it to refer to defendant and Wood, whom he saw crossing the railroad track and going southeast. He did not testify on the coroner's inquest about then seeing defendant and Wood and recognizing them by their voices, because no question to bring out that testimony was asked him.

O. B. Seitz testified, for the defense, that he was in Dulaney's store when the fatal shot was fired. As near as the witness could fix the time at which the shot was fired, it was about half

past nine o'clock. It may, however, have been a few minutes before or after that time. From Dulaney's store he went to the opera house, and, about forty minutes later, went home with J. H. Beall, where he found defendant and Wood, one of whom had a short gun. It was about ten minutes before eleven o'clock when witness and Beall reached Beall's house. Witness joined his wife as soon as he got to Beall's house, and did not hear the conversation between Beall, defendant and Wood.

The motion for new trial raised the questions discussed in the opinion.

*Cowan & Posey, J. F. Eidson* and *J. M. Clementson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant, being indicted for the murder of Ben Warren, was tried and convicted of murder of the first degree, and was sentenced to a life term in the penitentiary.

We will notice the alleged errors in the order in which they are assigned. First. "The court erred in changing the venue from Nolan to Taylor county." The court of its own motion changed the venue of the case from Nolan to Taylor county. Appellant objects because, Sweetwater being the county seat of Nolan county, Colorado City the county seat of Mitchell county, and Abilene the county seat of Taylor county, he contends that the venue should have been changed to Mitchell county, as its county seat was but twenty-eight miles distant from Sweetwater, whereas Abilene is distant forty-two miles.

This being a change of venue upon the motion of the district judge, he had the right to send the case to any county in his own or in an adjoining district. (Code Crim. Proc., art. 576.)

Second. The court should have continued the case or granted defendant a new trial because the motion for continuance was improperly overruled. The application to continue was to pro-cure the testimony of H. H. Williams, Thomas Barkston, Mrs. Martha Terrell and C. A. Powell. By several of these absent witnesses defendant expected to prove the time of night the killing occurred. By Barkston that he saw defendant pass Bradley's opera house that night about 9:30 p. m., going in a southeast direction, and did not see him any more that night. By Martha Terrell that she lived in the southern part of Nolan

county, and that, the day before Ben Warren was killed, two men inquired of her about him and said they had a settlement to make with him, and that Warren could not live in the same county with them, and that these men went off in the direction of Sweetwater, and also that defendant was not one of these men.

Let us concede for the argument that the diligence used to procure the attendance of these witnesses was perfect, the question remains; was there error in overruling the application, and was there error in refusing a new trial because of this matter? We have no hesitation in saying there was none, because the facts, if true, and if adduced on the trial, would not have affected the result of the trial in the slightest manner; and, while competent, the bearing, force and effect, when considered in connection with the facts adduced on the trial, would have been as chaff before the wind.

Third. It appears by the motion for new trial and certain affidavits that Robert Tuttle, one of the jurors, during the trial, by the consent of the State's and of defendant's counsel, was permitted to go home, guarded by the deputy sheriff, to visit his sick wife. That when they reached the house Tuttle invited the officer to have a seat, but he declined, leaving Tuttle with his wife and a girl in the room. Tuttle remained in the house a few minutes, but no one but his wife, and perhaps the girl, were permitted to converse with him. Tuttle swears "that he remained with his sick wife about thirty minutes; that no one was present except his wife and a little girl about eleven years of age; that there was nothing said about the case or trial at all. It was not mentioned except that his wife asked him how long it would be before he could come home. He replied that he thought it would be several days.

The rule upon this subject is that where there is a separation by permission of the court, to which the defendant then excepts, the judgment will be reversed without reference to injury or no injury to defendant. But in cases like the one in hand, and where the jury separate without permission of the court, to reverse, it must appear that the juror conversed with others about the case, or was guilty of misconduct to the prejudice of the accused. (Jones v. The State, 13 Texas, 168; Jack v. The State, 26 Texas, 1; Wakefield v. The State. 41 Texas, 556; March v. The State, 44 Texas, 64; Defriend v. The State, 22 Texas Ct. App., 570.)

Fourth. "Statements made by the accused while in jail or under arrest are not admissible against him, unless the same be voluntarily made after having been first cautioned that such statements might be used against him; and because of the violation of this rule there was error." By reference to the bill of exceptions it appears that defendant was simply confined under the rule as a witness; that, though suspected, there is no evidence tending to show that he knew of the suspicion against him. These being the facts attending the supposed arrest or custody, we hold that he was not in arrest or custody within the meaning of article 662, Code of Criminal Procedure. In the Wood case, a companion case to this, we held the evidence taken before the inquest inadmissible. (22 Texas Ct. App., 431.) This, however, was under quite a different state of facts.

Fifth. When the jury returned their verdict into court, the same was accepted and the jury informed that they were discharged. It being discovered that the verdict was informal, within a half minute after the verdict was returned, the jury was recalled to the box and the verdict was amended. When recalled, the jury were making their way to the clerk's desk to receive their warrants; only a few had gotten five feet from the place where they were standing when they returned their verdict, and half of them had not broken ranks.

Appellant moved for a new trial because of this separation, and insists that because of this matter the judgment must be reversed. To this we can not agree. Evidently from these facts there could have been no injury to the rights of defendant, and hence the above cited authorities apply and control.

Though we have not discussed all the points presented in the brief of appellant, we have noticed those which are deemed worthy of consideration, having given to all a close and critical examination.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

Opinion delivered December 15, 1887.