## Walter E. Shaw v. The State.

### No. 56. Decided May 17.

**1. Continuance.**—Where facts proposed to be proved by the absent witness, as stated in the application for continuance, are directly contradicted and shown to be untrue by written matter contained in the record in the case, *held*, that the application for continuance was properly overruled.

**2. Jury—Conversing with Juror After He has been Empanelled.** On a trial for murder, after the jury had been empanelled, one of the jurors was asked by an outsider if he, the outsider, should inform the juror's wife that he, the juror, had been selected on the jury. *Held*, that if it be conceded that this was such conversation as comes within the purview of article 690 of the Code of Criminal Procedure, still it would not constitute reversible error, inasmuch as it clearly appears that it could not have tended, in the slightest manner, to have affected the mind of the juror with regard to the case.

**3. Same—New Trial.**—In order to entitle a party to a new trial, or to a reversal of the case on appeal, upon the ground that a juror in the case has conversed with an outsider, it must be made to appear that by reason of such conversation injustice was probably done the accused, or was of such a nature as was calculated to result in probable harm to the accused.

**4. Practice—Jury—Postponement on Account of Absent Venireman.**—Where, on the call of the special venire, one of the jurors was found to be absent, and defendant requested a postponement until said juror could be brought into court, which was refused, and an attachment was issued for the absent juror, and the selection of the jury proceeded with; and subsequently the absent juror made his appearance, and was peremptorily challenged by defendant: *Held*, no error is suggested of which defendant could complain.

**5. Same — Oath to Sheriff and Deputies who are to Summon Talesmen.**—Where it appeared that the oath prescribed by statute, article 3056, Revised Statutes, had been administered to the sheriff before any talesmen had been summoned in the case, *held*, that it was unnecessary that the oath should be taken again, when it became necessary to summon additional talesmen; and especially so, where it is made to appear that before summoning said talesmen the sheriff was cautioned, as provided by article 615, Code of Criminal Procedure, with regard to his duty in summoning them. Following Habel v. The State, 28 Texas Criminal Appeals, 588.

**6. Examination of Venireman — Defendant's Right to do so in Person.**—Where a venireman, on his voir dire, has been fully examined by defendant's counsel, and defendant in person had also been permitted to ask him numerous questions, *held*, that the court did not err in prohibiting him from further asking questions wholly irrelevant and impertinent, and directing that the further examination should be conducted by his counsel.

**7. Arraignment.**—Usually a rearraignment under the same indictment is unnecessary, but there is no law against it, and it is difficult to see how a rearraignment could operate as error.

**8. Defendant's Right to Interrogate Witness.**—Where a witness has already testified very fully in reply to interrogatories propounded by both the defendant in person as well as his counsel, it is not error for the court to refuse to permit defendant to further repeat the same questions to the same witness, nor require him to confer with his counsel as to further examination of witness.

**9. Evidence — Voluntary Statement of Accused at Examining Trial.**—A voluntary statement made by the defendant at his examining trial, after he had been properly warned and cautioned as required by the statute, is admissible on his final trial as evidence against him. And its admissibility is not affected by the fact that at the time it was made he expressed a desire to waive a further examination of his case.

**10. New Trial — Prejudice of Juror.** — Where one of the grounds of the motion for new trial was the alleged bias and prejudice of one of the jurors who sat in the case, which was controverted by the State, and in *his* affidavit the juror denounced the imputed statement in most emphatic language, as untrue and maliciously false, and the issue of fact raised was decided by the lower court adversely to defendant: *Held*, that the ruling will not be interfered with. Washburne v. The State, 31 Texas Criminal Reports, 352, distinguished as to this point.

**11. Insanity.**—Where the issue of insanity has been fully investigated and submitted to the jury, in accordance with settled law, their verdict will not be disturbed where the evidence sustains the verdict.

**12. Murder of the First Degree.**—See facts stated upon which the court affirms a judgment of conviction for murder of the first degree, with the death penalty.

APPEAL from the Criminal District Court of Harris. Tried below before Hon. E. D. CAVIN.

Appellant was indicted for the murder of one Annie C. Shaw. Annie C. Shaw was his own mother. At his trial he was found guilty of murder in the first degree, with his punishment assessed at death.

The evidence developed the fact that he killed his mother, Mrs. Annie Shaw, and his aunt, Mrs. Isabella Johnson, by cutting their throats from ear to ear.

The defendant pleaded not guilty to the charge, and his counsel, who were appointed by the court to represent the defendant, urged insanity as a defense. The defendant differed entirely with his counsel about their theory of the case, insisting that they did not understand it, and had various theories of his own about the case, as the evidence and his own statement will show.

This case is one of much celebrity, and we therefore give the testimony in full, as we find it in the transcript of the record. It is as follows:

The State introduced the voluntary statement of the accused, made at his examining trial, as follows:

Walter E. Shaw, defendant, being instructed by the court that he was entitled to make a statement, but could not be compelled to do so, and that any statement made by him would be used as evidence against him in the trial of this cause in the Criminal District Court, made the following statement:

"I know and am convinced in my own heart that I am guilty, as true as I believe there is a God in Heaven. I do not want to be harassed

with needless questions, and want to waive examination. I was sober, and could prove it, at 6 o'clock, and was lucid and in my right mind when I went in that house, and was sober. I didn't do that thing when I was drunk. I know that I committed this God damned horrible deed; that I ought to be hung for it. The moment I knew what I had done, I made the same statement.

" WALTER E. SHAW."

Dr. S. E. Jones testified: I knew Mrs. Annie Shaw during her lifetime. She died March 31, 1892, in Houston, Harris County, Texas; her throat was cut from ear to ear. It was between 9 and 10 o'clock on April 1, 1892, when I visited the house of Mrs. Shaw. I found the bodies of Mrs. Johnson and Mrs. Shaw. The dining room was just off the bed room; under the dining room table Mrs. Shaw was lying, and on the floor Mrs. Johnson was lying, with her throat also cut, and a handkerchief stuffed in her mouth. I found a bloody razor, badly gapped; I picked it up, and laid it back just where I found it. (The razor was shown to and identified by the witness.) Mrs. Johnson's throat was also cut, and she was dead. I went through the household furniture; it was disturbed, and blood-stains were on the linen and bureau. Mrs. Johnson was under treatment for cancer, and in an emaciated condition. Mrs. Shaw's throat was cut down to the bones of the neck, and I could see the bones exposed through the cut in the flesh.

Cross-examined: The condition of the razor when I found it was as it is now. I can not say whether it is blood on the razor or not, but it had that appearance to me. I saw nothing else about the place which would have produced the wound.

Dr. J. F. Stewart testified: I saw the dead bodies of Mrs. Annie C. Shaw and Mrs. Johnson at their house on April 1, 1892. The cause of the death of Mrs. Shaw was an incised wound on her throat from ear to ear. I saw Mrs. Johnson, and her death was caused by a similar wound of the same character. I first saw this razor at the house of the deceased on April 1, 1892, and it had blood on it. I think it is the same razor you show me now. It would have caused the wounds. Blood was all over the house. Back of the room where the bodies were I found where somebody had evidently washed bloody hands. I saw Walter E. Shaw in jail the next day, April 2, 1892; he had a cut on one of the fingers of the right hand. I saw underclothes and a shirt; I believe them to be the same that you now show me; blood marks were near the button holes. I found under the nails of Shaw what I took to be blood. Death was very recent when I saw the bodies of the ladies. My opinion is, that death was instant from the use of the instrument on their throats. A pocket handkerchief was stuffed in Mrs. Johnson's mouth.

Cross-examined: The razor with the gaps now in it would have pro-

duced the wounds. I can not tell whether the blood was human or not. I can not say how bloody water came where I found it. I have no recollection of treating the defendant for insomnia, and no recollection of ever prescribing for his grandmother or for him. I performed an operation on his aunt, and that was the first time that I saw the defendant. She seemed to be glad to have the defendant near her during the operation I performed upon her.

T. Blake Dupree testified: On the examining trial Shaw said that he wanted to make a voluntary statement. I warned him that he could not be required to say anything, and that anything he might say could be used in evidence against him, but not for him, on the final trial of his cause; but he persisted in making the statement. The statement was made voluntarily by him. Justice Gentry wrote the statement, and it was signed by Walter E. Shaw, and this paper now shown me is that statement. Justice Gentry also warned him in the terms of the law, and reduced it to writing, and all the alterations made were at Shaw's suggestion after having heard it read.

Cross-examined: Shaw did not waive examination. There were no witnesses except himself, which was sufficient, as he made a prima facie case. He was not represented by counsel, but Mr. Oldham, a lawyer, warned him as to making the statement. Shaw replied that he knew what he was doing, and persisted in making it.

Sheriff George Ellis testified: I arrested Walter E. Shaw at Galveston, Texas, and brought him back. We stripped him and found upon him the clothing which I now show you, and about which Dr. Stewart has testified, being drawers, undershirt, and one sock. This razor was given me by Justice Gentry. I took Dr. Stewart to the jail. There were numerous scratches on Shaw's hands, as if by person's nails; also a cut. Had to hold him to take his clothing off. When the clothes were removed, blood-stains were on them. He had on shoes, but no socks. I received a sock from the police of Galveston; the one I show you is the sock; it is exactly of the size and kind of a sock as others which were found in the house of the defendant. The wounds and scratches on the defendant were recent.

Cross-examined: I saw the wounds and scratches and the cut when I brought him back. They were recent.

Archie Anderson testified: I examined the house where the murder was committed. Mrs. Shaw was lying near the middle of the floor, Mrs. Johnson in the door. I found a shirt on the dining room table, which is the shirt I here show you, which was considerably torn. I found a basin of bloody water near the cistern. The bureau drawers and all the trunks had been gone through, and the linen had bloody finger marks on it. I found buttons and some ashes in the heating stove, being these I show you, and comparing them with those on the undershirt and drawers, they

appear to me to be the same as worn by defendant. The stove was in the bed room of the house where the murder occurred. The shirt found in the room, as described above, compares as to size, make, and shape with that worn by defendant. A handkerchief was stuffed in Mrs. Johnson's mouth. The stove had ashes in it. I was there between 11 and 12 o'clock, April 1, 1892. Some persons were already there.

William Kreiss testified: I know Walter E. Shaw. I saw the defendant on March 31 (the same evening Mrs. Shaw and Mrs. Johnson are said to have been killed), between 8 and 9 p. m. He passed me on Congress Street. Shaw told me was going to Galveston for his aunt, as he had sick folks at home. He invited me to take a drink with him, and paid for them. He had money; about $25 or $30. He ran and caught the train. The money appeared to be in $5 bills, but I only saw one bill so as to be able to say what it was, and that was a $5 bill. I judge from the size of the roll, and the bill I saw.

Cross-examined: It was the Santa Fe train, about 8:50 at night, that Shaw took. I heard of the murder next morning. I saw him and the money he had; I simply guess at the amount; I don't know how much it was. Shaw was not drunk. He was used to drink and drank steadily; it had no effect upon him. I told Sheriff Ellis the next day that Shaw had gone to Galveston.

Frank Stein testified: I saw Walter E. Shaw the evening preceding the night of the murder. He and Kreiss came to my place about 8 o'clock, and said he was going to Galveston to get his aunt, as his folks were sick. He pulled out a bundle of money and said it was election money. After the train left Kreiss came back.

Cross-examined: Shaw appeared to have about $50. Can not say how much for certain; I could see that he had more than one bill in his hand. Shaw often came to my place. I did not think Shaw was drunk that night. I never sold him liquor when he was drunk. He drank bitters on this occasion.

R. E. Kirkpatrick testified: I was passenger conductor on the Santa Fe train on March 31, 1892. The defendant started to Galveston on my train about April 1; twenty-four hours later I heard of the murder. Shaw appeared to be drinking when on my train. His hand was tied up. He gave me a $5 bill to take his fare out. He said that he had cut his hand on the seat, and that is why he had it tied up; there was nothing on the seat for him to cut his hand on.

Cross-examined: He could not have cut his hand on the seat. He appeared to have been drinking, but was not boisterous. It was about 8:50 at night when he took my train. He got off my train at Alvin, and I do not know where he went.

Mr. Williamson testified: I was a special officer of Galveston on March 30, 1892. Shaw was brought to the city jail on the night of March 31,

1892, or rather early on the morning of April 1, 1892. He talked to me in jail; he was wild and talkative. His finger nails had been scraped clean all round. He was brought in for being drunk. He had no socks on, but had one in his pocket; he pulled it out searching for tobacco, and I gave him some. I talked with Shaw, and he talked intelligently.

Cross-examined: He was arrested in Galveston as drunk and down. I do not know whether defendant was in a stupor or not when he was brought in.

Dr. Arnold testified: I saw the dead bodies of the ladies who were killed. The razor you show me would probably have been gapped in the manner it is by its being used in cutting their throats.

Mrs. Mary Jones testified: I know the defendant, and I knew his mother and aunt very well; we lived near them. His aunt and his mother were very devoted to him, and very kind to him; they did everything they could to make him comfortable. He used liquor or intoxicants to excess, and was often boisterous and excited in his manner when at home, and by reason of his habits, his drunkenness, and use of intoxicants, he was a source of great trouble and annoyance to his mother and his aunt. The night of the murder I was at the house of Mrs. Shaw, and saw the defendant there. It was about 6 o'clock, and I judge of the time by the fact that they had just lighted the lamps in the house. I knew his voice, which I heard, and saw him through the door of the next room. I left and went home, which is in the next house, and heard nothing until next morning.

Mrs. W. E. Goodwin testified: I know the defendant, and I knew his mother and his aunt. I lived once in the same house with them. His mother and aunt were very devoted to him. He drank very hard, and was often very rude and threatening to his mother and aunt. They were kind and devoted to him, and gave him no cause for any such action on his part. His habits as to the use of intoxicants were very bad, and I heard him say on one occasion to his mother, "You damned old bitch, I will cut your throat yet."

Cross-examined: In response to an interrogatory of the prisoner, the witness said: "I never saw you drink any liquor, and I do not know of my own knowledge that you drank liquor; but I do know from your condition that you were under the influence of something the most of the time. On many occasions you must have been under the influence of liquor or something, or you could not have stated the things to your mother and aunt that you did."

E. C. Crawford testified: On the day of the funeral of the defendant's grandmother, five, or six years ago, he was very drunk. His habits as to drinking whisky have been very bad. After the killing I looked for money amongst the effects of Mrs. Shaw, but found none. I knew

that she ought to have money, because I had paid her some a short time before.

John Windletts testified: I am clerk and cashier for E. C. Crawford, and about ten days before Mrs. Shaw was killed I was directed by Mr. Crawford to pay her a balance due her, which I did, and paid her something over $40. I don't know what kind of money it was, but think it was in $5 bills.

W. W. Glass testified: The testimony given by the other witnesses as to the condition of the premises and positions of the bodies is correct; I was there, and I know what has been testified about it is correct; it corresponds with my own observation. I saw bloody footmarks on the floor, as if made by a person in stocking-feet, and they compared as to size with those of defendant.

*Defendant's Evidence.*—W. N. Shaw testified: I am distantly related to the defendant. I have known him all my life. I have known him intimately. I have seen him from week to week for the last ten or twelve years. Up to the time of the murder he was dissipated, from drinking or the use of drugs, I can not say which. I rarely saw him when he was not under their influence. In this particular instance, as it was in many others, he was rendered a fool, but was not as he was before he began drinking. His whole condition seemed changed, and he had a strange glitter in his eyes. He came up to me at one time and told me that he was now living on whisky and morphine. That has been about a year ago. I am not well enough acquainted with the defendant's mother's family to say whether insanity was hereditary in her family or not. I do not know what relation existed between defendant and his mother. I never visited his mother, though I am not unfriendly to her. I can not of my own personal knowledge tell you the details of an attempt to assassinate me by him, of my own knowledge. I can only tell you what others told me as to where he was and what he had in the way of a weapon, and what his purpose was. Of course all this is hearsay, of what others told me; I do not know it of my own knowledge. It was a very rare thing to see the defendant except under the influence of drugs or liquor; it was something, I think, besides liquor. His habits as to the use of intoxicants or whisky or drugs has been continuous for some five or six years. In my opinion, his mental condition is not sound. His conduct has been such as to alienate his affections with the rest of the family from him.

Judge Gustave Cook testified: I defended Walter E. Shaw in his former trial in April. I was thrown a great deal with him during that time. My acquaintance with defendant has been casual for some years, but I had no knowledge of his mental condition beyond his standing as a busi-

ness man, which was that above the average.  After the court appointed me to defend him, I observed him closely.  His manner indicated extreme tension.  He seemed excited; was not normal.  His manner was nervous, though he seemed to make an effort of self-restraint.  The manner of defendant was strange; he was dictatorial and rude, especially so to me.  On the former trial he insisted on entering the plea of guilty to the bill of indictment, against my wishes.  He said that he would thwart me should I attempt to defend him.  I could not see how a sane mind could conceive and execute such actions.  The finding of the jury before was " guilty," and he thanked the jury with a great deal of theatrical display, natural to him.  He appeared to give more attention to the cigarette than to his case, and did not appear to have any idea of the solemnity of the occasion.  He did not want any counsel, and it was only as a sort of personal favor to me that I was allowed to interfere in the case.

Cross-examined:  He said to me that he was satisfied that " I am guilty, and I am convinced that I am guilty."  That one who was guilty of such a damnable, outrageous murder ought to be hung.  I haven't the least doubt that if a proposition of facts constituting a homicide were presented to him, he would know the illegality of murder.  I think he would know the right and wrong of murder.

Redirect:  He never, in any manner, shape, or form, stated that he had any knowledge of the facts, but continually stated, in an argumentative way, that he was convinced of his guilt, and satisfied of his guilt.  Whenever we talked of it, he remarked that he was convinced of his guilt and satisfied of his guilt; never under any circumstances did he say that he was guilty.

Dr. D. R. Wallace testified:  I am a physician.  My special practice is insanity and nervous diseases; have been engaged in practice of this nature for twenty years.  I have been connected with the insane asylums at Austin and Terrell.  It is a hard matter to give a definition of insanity; in a few words, it may be said to be mental freedom impaired.  To illustrate:  A man may be insane, and still appear to be sane.  Mental insanity is caused more from alcoholism than from opiates.  Whisky stimulants, indulged in constantly, may bring about, and does often bring about, mental derangement.  I can not say whether a man could commit murder and be insensible to the act.  There is such a thing as monomania.  I have never seen such a man but that his mind was otherwise affected than with the cause attributed to him.  A test would be, with me, if the accused knew right from wrong and is free to do what he wishes, I look upon him as a responsible being.  I have had patients to ask me to restrain them, for fear they might do some harm.  A man may do things he knows is wrong, still he can not keep from committing.  Persons who are insane are liable to be suspicious.  Insane people are

very sagacious and cunning, and are very apt in concealing their acts. There is such a thing as homicidal mania, and we can judge of it only from the facts of the case. It is true, there is such a condition that a man may be in contact with his fellow man for a long period of time, and be entirely rational on every question, and disclose no evidence of mental unsoundness, yet suddenly, by reoccurrence of the mania, becomes within a short time unable to control his mind and irresponsible for his acts. It is a fact that a man may display shrewdness and method, and do acts indicating plan and purpose of method—or, in other words, a man may evince intelligence and shrewdness—and yet be, to all intents, insane. A man may have a mania for taking human life, but still they are subject to other mental diseases, and may have shown manifestations of it before. This homicidal mania does not apply mainly to taking the life of a near relative. I know of no such case. When a man appears sane, and has killed a friend, it has been found out that the man was not sane. I know of one such instance. In this case, where the patient, who had been treated for insanity at the asylum at Austin, was discharged as being a sound man, and was considered by the physician in charge of said institution, namely, Dr. Reeves, as being restored to his normal condition of mind; and one day the said patient, Mr. Purnell, took his gun, and, without a moment's warning, shot his keeper, Dr. Reeves, dead. But both professional and unprofessional people had warned Dr. Reeves that the man was insane, and was not cured.

Insomnia is sleeplessness; the effect is a general derangement of the health; if protracted, the man would die. If a person has lost eight or nine days sleep, it would not produce insanity. Insomnia will not produce insanity. I know of no case where the mind became deranged from insomnia. From the testimony heard in this case I would state, that the accused, at the time of the killing, showed a certain unsoundness of mind, but was in full power of his senses as to the wrong he was doing. I do not think he was in his normal condition, nor is any man who is under the influence of narcotics; still he knew right from wrong, and had full control of his will powers. I regard Spitka and Hamilton good authorities on insanity. I have listened to the testimony in this trial, and have watched the defendant's conduct, and have seen all that he has done, and heard all he has said.

Dr. J. J. Burroughs testified: I have been a practicing physician for thirty years, having practiced my profession constantly during that time. I have read all the standard authors on insanity; in fact, I have read every author of any consequence on insanity, and I have in my practice come in contact with many cases of insanity. I don't believe Shaw did the killing. A man may be insane, and at the same time conceal the disorder upon all subjects save perhaps one, and may appear sane upon all subjects save the one upon which he is insane. A person laboring under

homicidal mania is liable to attack any one whom he may meet. A shocking sight might produce grave results upon a man who had long suffered with insomnia. I have not heard the testimony in this case, but did hear that of a former trial, but I do not think the defendant's mind is sound. If Shaw committed the murder, I believe he was insane; but I have had serious doubts whether he committed it.

Dr. S. C. Red, being recalled, testified: That he believed the prisoner was mentally capable of comprehending the enormity of a murder. He thought insomnia would affect the body before it would affect the mind.

Dr. Turner, being recalled, testified: That he did not consider himself an expert on insanity nor insomnia. He had made no study of either, but would not admit insomnia to be a species of insanity. In his opinion, insomnia would never affect a person so that he would be violently insane one day and all right the next.

Dr. J. W. Daniels testified: I have practiced my profession for thirty years. I have read all the standard authors on insanity. There is such a thing as homicidal mania, and it may be brought about by the continuous use of intoxicants to excess. In such cases people who are thus affected would be liable to kill any one with whom they came in contact, even those most dear to them. I do not claim to be an expert on insanity. It is a condition of the brain that produces insomnia, and a shocking sight might for the time being unbalance a man so affected.

Mr. Jordon testified: That he had been a police officer, and had seen Shaw in the lockup in Galveston on April 1 last. He testified that the sock shown him was found in the police wagon in which the defendant was taken from the police station in Galveston to the depot, when sheriff George Ellis came and took defendant back to Houston; and that the sock had blood on it.

George Ellis, being recalled, after the defendant, Shaw, had testified, testified: That the sock was delivered to me by mail from Galveston, and the sock shown him was the same sock; and also testified that Shaw told him in jail about killing his mother and aunt. That Shaw stated that he talked with his mother, and that he saw the razor on the table. That his aunt came in twice, and was taken back to bed each time by his mother, and after he had killed his mother, his aunt came back again, when he stuffed a handkerchief in her mouth and cut her throat.

Dr. D. F. Stuart, being recalled, testified: That from his acquaintance with Shaw, he regarded him as a responsible being, and knew the right and wrong of murder. He had never heard of insomnia producing insanity. I am a practicing physician for thirty years. I have read all the standard works on insanity, and have treated many cases of insanity. In my opinion, the defendant, at the time of the killing of Mrs. Shaw, knew the difference between the right and wrong of homicide.

J. R. Riordan testified: That Shaw, for a long time prior to the kill-

ing of his mother and his aunt, had been addicted to the continuous use of liquor to such a degree as to put him in an abnormal condition of mind. That he was not himself, and that he was commonly regarded as cranky. I met Walter E. Shaw, the defendant, in Houston between 5 and 6 o'clock on the evening of March 31, 1892, the evening Mrs. Shaw was killed. I talked with him, and he was cool and sober. He told me that he was on his way home.

John Valentine testified: That he knew Walter E. Shaw intimately for a number of years. That for some years prior to the killing he had been addicted to the use of liquor and intoxicants, using them constantly to excess, and to an extent as to make himself annoying and disagreeable with everybody he came in contact with.

Walter E. Shaw testified: While my attorneys have attempted to establish insanity, they can not do it—I am not insane. I have suffered with insomnia three or four years. At the time this charge was made against me, I was not in a state of mind to know what the charge was. I knew through my disordered brain, that no glimmer of guilt had entered. Ellis had staggered me by telling me that there was an eye-witness. Mother had been suffering for years with nervous sick headache, and had been the sole nurse of my aunt, and from the strain on her she was nearly crazy. I had been suffering from insomnia for eight or nine nights, and I went to Joseph Hart's saloon to get a drink. I had a long conversation with mother, and she asked me to tell aunt she could no longer nurse her. I was engaged to marry a young woman, and was to marry her the week after the election. I had sacrificed my happiness on account of a young lady whom my grandmother had forbidden me to marry. Then I was the support of grandmother and mother, and had made sacrifices for them, as they had for me. When I left the house I had an understanding with mother that I should go to Galveston and marry the girl, but would not proclaim the marriage. Dr. Stuart told me that aunt could not live to July. A woman had died of malignant cancer, and aunt had heard of it. I had told aunt if any fatal illness came on, I would administer something that would put her out of misery. Aunt was a woman of great fortitude, and had been told that she could not live a year. She had asked me the doctor's opinion, and I told her. That day aunt had seen me and mother have a long conversation. My cellmate knows that in certain periods of insomnia I told everything that I knew. I had told the whole story of my connection with the young lady, and my purpose in going to Galveston was to stay there. As far as the $40 is concerned, I do not know how I came by it.

My aunt, when I went out, asked when I would come back. To have left my mother after my aunt's death, I could not think of. The young lady to whom I was engaged would have a little money on coming of age, and would soon become a mother. I told aunt everything, and she

was worried lest I would not come back. When I left the house it was about 5 p. m. I was no longer fit for a clerk, as I was in bed about a week out of a month. I did not take the drink because I was sick. When I went home the evening of March 31, 1892, I saw Dr. Arnold's buggy at our gate, and I went into the house the side way, the door opening into the gallery, and went into my room, and lay down, very nervous, but I knew what I was doing. When I went in, I heard Mrs. Jones' voice, talking with mother. Mother then came in and renewed the conversation; told about an aunt in Louisiana, who continually wrote that her husband was no account, and me no better, and it would be better if all were dead. Aunt made me promise that when I knew that she had a fatal disease, I would give her something to put an end to her life. I would make good the promise. There are two or three rooms, and we were in the dining room. Mother was saying that it was only her will power that kept her up. She was in a nervous and excited state, and one night ran out in the street in her night clothes. She had a desire when in this condition to get out of the house. Aunt came out while mother and I were sitting at the table at almost dark. I soothed my aunt, and carried her back to bed, and went on the gallery the second time to fill a lamp, and aunt came out again, and mother soothed her and put her to bed. Mother said that she did not know what to do; that she was almost crazy. I told her I would bring her something from Galveston. I was perfectly sober. When through filling the lamp, I came in and heard a coarse scream. The razor was not kept where I knew it was, and I had not shaved myself for a long time. When I came in, I saw mother with the razor in her hand, and she said, "I will kill her and end her misery myself; you would not do it; and then you can kill me and go and live with your Viola." The expression upon her face was the strangest I ever beheld. With one bound, I was at my mother and seized her. The details of what happened I can not relate, for I do not know what they were. Thank God for that.

I know that I killed my mother and my aunt; of course there is no doubt about that; but the details of the horrible and awful affair I do not know. I am not making this statement with the hope of saving my life, for my neck is the least valuable of my possessions just now. I know that I committed the deed and jumped on my mother, and there was then not a scratch upon her. I know I am guilty of the commission of the crime, but do not hold myself responsible. I have never used morphine, and if I had and have been led to this crime I would deserve death. I pleaded guilty on the former trial. I said I must be guilty. I knew nothing more until I woke up in the lockup in Galveston, and a man told me that I had a fight with a hack driver in Galveston. I suppose the cut on my hand was made by the razor. There was a crowd about the calaboose,

and with the caution of any man I did not ask any questions. About the conversation with Ellis I have no recollection. I think I remember being stripped in the sheriff's office. In jail I was told Ellis wanted to see me, and I said, "It must be something tough," and Anderson said, "Yes, it is." The first thought that entered my mind was that the people at home would think that something was the matter. The young lady to whom I was engaged had sent me $75, and I had given my aunt $60 of this to keep. My mother always carried her money about her person, and I knew where every article of value about the house was. I did not tell Sheriff Ellis that I committed the murder. I have been credited with the assassinations of Hennessey, Brown, and Hobson; those things, however, I never did. But I did that which is far worse, and that is the ruining of a confiding young girl; and then this charge being made against me and my imprisonment, and my inability to make reparation for the wrong I had done. This is the severest blow I have ever had to bear; to think that I had put this young lady in such a position, and disgraced her and ruined her, who was about to become a mother, and I in jail upon a charge of murdering my mother and aunt, has troubled me by day and night more than anything else, for I know I am not responsible for the killing of my mother and aunt. I did it, but, as stated before, I have no recollection of the details. I was not responsible for what I did; but in ruining this young lady I was responsible, and did a thing I ought not to have done. As stated before, I am not making this statement with the hope of saving my life, for life and I have no attachment for each other. I do not know any of the details of the awful killing of my mother and aunt, and I have never heard the evidence in the case; deaf in one ear, I place my hand over the other, thus excluding the evidence. I have never heard it, and will never hear it.

The following is the bill of exceptions, as qualified by the trial court, referred to in the opinion:

"On the trial 'the defendant insisted upon his right in person to interrogate the venireman E. M. Coglin as to his qualifications as a juror, which the court refused to permit the defendant in person to do, insisting that he must do so through his counsel, and should not ask the questions in person; which action of the court, in refusing to permit the defendant in person to interrogate said venireman, the defendant then and there excepted to, and now tenders this, his bill of exception, and prays this be allowed, filed, and made a part of the record in this cause.'

"The foregoing bill of exception was this day presented to me, and I allow the same, with the following explanation, qualification, and correction: The venireman Coglin, on his voir dire examination, fully qualified as a juror, and was fully interrogated by the defendant's counsel, and then by the defendant in person; and after numerous questions had

been asked said Coglin by the defendant, the questions asked by defendant became wholly irrelevant and impertinent, and I finally directed him to confer with his counsel, and get his questions directed to proper matters, as they could conduct the examination in a proper and orderly manner. This was after the defendant had in person interrogated the venireman Coglin at length, and to this he in person excepted. Throughout the entire case he was in person permitted to interrogate both veniremen and witnesses, and made a speech in his case to the jury. The venireman Coglin was finally challenged peremptorily by defendant, but he did not exhaust his peremptory challenges, and only used nineteen of such challenges. With and subject to the foregoing explanation, qualification, and correction, I allow this bill of exception, and order the same to be filed by the clerk as a part of the record in this cause.''

*A. C. Allen, C. W. Bocock*, and *W. S. Oldham*, for appellant, filed an able and interesting brief in the case.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—Appellant prosecutes this appeal from a conviction of murder in the first degree, in which the penalty of death was assessed.

1. The court did not err in refusing the application for a continuance for the witness Gentry. It is not true that this witness would have testified as set forth in the application, which is made fully to appear by the record.

2. Pending the empanelling of the jury, one Hill asked the juror Gaston if he should inform Mrs. Gaston that he had been selected as a juror in the case. Gaston only heard a part of the remark, and did not enter into conversation with Hill. Conceding this remark to be a conversation with the juror, within the purview of article 690 of the Code of Criminal Procedure, it clearly could not have tended in the slightest manner whatever to affect his mind one way or the other in regard to the case. Remarks to or conversations with jurors do not necessarily constitute ground for granting a new trial. In order to entitle a party to a new trial under such circumstances, it must be made to appear that by reason of such conversation injustice was probably done him. It must be such as was calculated to produce a more unfavorable impression upon the mind of the juror than that made by the evidence adduced on the trial, or it must be of such a nature as was calculated to result in probable harm to the accused, in order to constitute a ground for a new trial, or in case of its refusal, to authorize a reversal on appeal. Nance v. The State, 21 Texas Cr. App., 457; Bailey v. The State, 26 Texas Cr. App., 706; March v. The State, 44 Texas, 64.

3.  When his name was reached on the list, one of the veniremen failed to respond, and defendant requested a postponement of the trial until the juror could be brought into court. This was refused, attachment issued, and the call of the veniremen proceeded. Subsequently the juror made his appearance, and was peremptorily challenged by defendant. There was no error in this ruling of the court. Hudson v. The State, 28 Texas Cr. App., 323; Habel v. The State, 28 Texas Cr. App., 588; Suit v. The State, 30 Texas Cr. App., 319.

4.  When the special venire had been exhausted, the sheriff was sworn and instructed in relation to his duties in selecting and summoning talesmen. Finally, after exhausting two lists of talesmen, twenty-five additional talesmen were ordered and summoned. Upon the return of this list, the defendant " declined to proceed with the case, on the ground that they were not legally summoned, in that the officer had not been sworn according to law." The oath had been administered prior to summoning the first list of talesmen. He had, however, been duly cautioned by the court as to his duty in each instance before summoning additional jurors. It is " not necessary to have the oath repeated every time new or additional talesmen are to be summoned." Habel v. State, 28 Texas Cr. App., 588.

5.  The discretion of the court was not abused, nor the rights of defendant infringed, in refusing him permission to interrogate the juror under the circumstances set forth in the bill of exceptions as qualified by the court. The discretion was not exercised until the defendant resorted to irrelevant and impertinent questions.

6.  On a former trial, defendant, having been arraigned, pleaded guilty, and his punishment was assessed at death. His insanity at the time of the plea was subsequently made one of the grounds of his motion for a new trial. When the case was again called for trial, he desired to enter a plea of not guilty, and for this purpose was again arraigned. Objection was urged that he could be only once arraigned. We have not been cited to any authority in support of this proposition, nor have any reasons been suggested why it should be held to be correct. We are of opinion that the position is not a sound one. Usually, a rearraignment under the same indictment might be unnecessary, yet it would be difficult to see how it could or should operate as error. Under the facts of this case, the court acted with due prudence and caution in causing the second arraignment.

7.  The court did not err in refusing the defendant permission to interrogate Dr. Wallace as to matters shown by the reserved exception. This witness had testified very fully in relation to the matters inquired about, in reply to questions of defendant in person, as well as interrogatories propounded by his counsel.

8. The voluntary statement made by defendant was properly admitted. It is shown by the statement itself, the evidence of witnesses, and the defendant's testimony, that he was properly warned and cautioned, as required by the statute, before making it. The fact that he expressed a desire to waive examination would not affect the admissibility of the evidence, nor operate as a reason for its exclusion. Salas v. The State, 31 Texas Cr. Rep., 485.

9. The alleged prejudice of the juror Schlissinger is made a ground of the motion for a new trial, and is supported by the affidavits of McFarland and Williams. By these affidavits it is shown that the juror stated that defendant " ought to be hung " and " ought to be burned." This was controverted by the State. In his affidavit the juror denounced the imputed statement in most emphatic language as untrue and maliciously false. The issue of fact thus found was decided adversely to defendant. Willson's Crim. Stats., secs. 2558, 2560. The rule laid down in Washburn's case, 31 Texas Cr. Rep., 352, is correct, but is wholly inapplicable to the facts in this case, for in that case the statement imputed to the juror was not denied.

10. The question of insanity was fully submitted to the jury, in accordance with the settled law of this State. The jury decided this issue adversely to defendant, and we see no reason to disturb their verdict. Motives for the deed are clearly shown. The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.