## CARLOS FERNANDEZ v. THE STATE.

No. 19203. Delivered April 6, 1938.
Rehearing denied June 1, 1938.

The opinion states the case.

*Dave Watson,* of San Antonio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, death.

It was charged in the indictment in substance that appellant, with malice aforethought, killed John Stowe by shooting him with a pistol.

Shortly prior to the homicide appellant and Joe Aycock had been drinking together. In the course of the evening they went to the Kentucky Club in the city of San Antonio. Aycock was

carrying a pistol. As they approached the club, Aycock observed a city policeman standing near the door. At this juncture appellant engaged Aycock in a scuffle. The latter protested with the statement that the officer was looking their way and might observe the pistol. Releasing Aycock, appellant seized the pistol, ran into the club, and entered one of the booths. Deceased, who was a city policeman, was in the club. Upon observing that appellant had a pistol, the proprietor had deceased advised of such fact. One of the parties seated in the booth near appellant said to the appellant: "Watch out; there is the law." Appellant replied: "I ain't scared of any s— of a b—." Deceased walked toward appellant, saying: "You are under arrest." Without warning appellant fired two shots into the body of deceased. At the time deceased had not drawn his pistol. Deceased fell to the floor mortally wounded as appellant fired two more shots at him and fled from the club with the pistol in his hand. Deceased fired one shot at appellant after he (deceased) had fallen.

After appellant's arrest he stated to the officers the course he had taken on the night of the homicide. Following the directions of the appellant, the officers went to a fence behind a church and there found the pistol appellant had used in slaying the deceased. One of the officers said: "The gun was laying on the ground with a few leaves on top of it. There were four empty shells in the gun and we marked those shells." In directing the officers to the pistol, appellant told them that he did not remember anything that occurred in the Kentucky Club on the occasion of the homicide. However, he stated to them that he remembered going over the fence. Again we quote from the testimony of the officer: "He told me that if he did have a pistol where he lost it by the fence and he also told me that he did not remember anything that occurred in the Kentucky Club. The only thing that he recollected was going over two fences near a church. We got a written statement from him afterwards and I have that written statement."

The State introduced in evidence the appellant's statement, which, omitting the formal parts, reads as follows:

"Yesterday afternoon, December 2, 1936, I was downtown and bought me some clothes,—a hat, shoes, two pair of trousers and a black leather jacket. I went home about six P. M. and put on some new clothes that I bought. About seven or seven-thirty P. M. last night I left home with an uncle of mine, Manuel Alvarado, and we went to look for another uncle of mine, Dell Salinas. We found Dell Salinas at the Kentucky Club at 414 East Commerce Street. It was about eight P. M. when we got

to the Kentucky Club. All three of us drank a couple of bottles of beer apiece; then they both left and I stayed there. I went to the Better Home Ice Cream Company on East Commerce Street and bought them two sandwiches and had them wrapped and brought them back with me to the Kentucky Club. I stayed at the Kentucky Club until about 10:30 or 10:45 P. M. I ate the sandwiches there and had some beer with them. Then I left there about 10:45 P. M. and went to Aycock's Pharmacy at Chestnut and Center Street. Joe Aycock and myself had some drinks there—gin—and then we both left for the Chicken Shack on Commerce Street. We did not eat anything and Joe got a negro there and brought me back to the Kentucky Club. It must have been about 11:35 P. M. last night. I remember going back to the place but do not remember going in. The next thing I remember is running down Center Street, the 100 block, turning to the left in the rear of a church where I jumped a fence, and I walked some and then jumped another fence. I think that I dropped a gun when I jumped the second fence. The next thing that I knew is that I woke up in a house at 609 East Crockett Street where a friend of mine lives. His name is Gregorio Rodriguez. It must have been about 4:30 A. M. this morning when I woke up. I thought I would go home and sleep and started walking home and just as I turned the corner to go to Ellis Alley a policeman called me and put a light on me and I went to him and the police put me in the car and brought me to detective headquarters. After I was brought to the police headquarters I thought that if I had a gun, I lost it jumping over a fence and I took Captain Hopkins, Amacker and Proudfoot to the place where I had jumped the fences and we found the gun. This is all I can remember about this case because I was drunk."

Several witnesses for the State testified that in their opinion appellant was under the influence of intoxicating liquor at the time he killed deceased.

Appellant took the stand and testified that he, Charlie Drake and Joe Aycock had been drinking together several hours prior to going to the Kentucky Club. It was his version that he was intoxicated to the extent that he had no recollection of the killing of the deceased. At this juncture we quote from his testimony, as follows:

"I heard the witness tell about me going back to the club and how that Mr. Stowe came across to me but I do not remember anything at all about that. I have never had any ill-will or feeling against Mr. Stowe for any reason and did not know him. I did not that night or at any time, have any intention

or desire to harm Mr. Stowe. I do not remember the shooting that occurred in there and do not remember anything. I did not have any intention to kill anyone at any time that night. I do not recall a man coming up to me and touching me on the shoulder and pulling me around by the arm and I do not remember whirling around and shooting him and do not remember anything of that description. I did not have any intention of killing Mr. Stowe there that night. I did not intend to shoot him at all. I have no recollection of his pulling me around and I did not, as far as I know, know anything. I do not remember anything about it. I do not remember firing any shots at Mr. Stowe and I had no intention to shoot him at any time. I had never had, prior to that time, anything, ill feeling, hatred or malice toward Mr. Stowe for any reason and have never had any difficulty with him of any kind. He had never arrested me for any transaction. I do not remember firing the pistol that night and I do not remember that Mr. Stowe fell and that I fired four shots. I do not recall going out of the club that night. There was no time that night, after I got to the Kentucky Club that I remember anything that occurred and I do not remember anything that occurred there that night after I left the Kentucky Club. I know where I waked up but when I waked up I did not have any recollection of any transaction there the night before and I had no recollection of anything occurring as I left the Kentucky Club. After I left the Kentucky Club I walked to this man Louis' home.

"I remembered the next morning that I had jumped a fence and I had a sore shoulder. I showed that to the detectives the next morning and I told them that I remembered running behind the church and jumping the fence and then walking some and jumping another fence and if I had a gun I lost it there but I do not remember that I had a gun, and I do not remember how the gun got where it was. I did not have any intention in my mind of concealing that gun and I told them that if I had a gun I must have lost it in one or the other of those places."

Appellant was about nineteen years of age at the time of the homicide.

The court gave in charge the provisions of Article 36, P. C., which we quote:

"Neither intoxication nor temporary insanity of mind produced by the voluntary recent use of ardent spirits shall constitute any excuse for the commission of crime. Evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in mitigation of the penalty at-

tached to the offense for which he is being tried. When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was brought about by the immoderate use of intoxicating liquor, the judge shall charge the jury in accordance with the provisions of this article."

In applying the law of murder with malice to the facts, the court instructed the jury as follows:

"Now, if from the evidence you believe beyond a reasonable doubt that the defendant, Carlos Fernandez, on or about the 3rd day of December, 1936, in the County of Bexar and State of Texas, with malice aforethought, did voluntarily kill the said John Stowe by then and there shooting the said John Stowe with a pistol as alleged in the indictment, you will find the defendant guilty of murder and assess his. punishment at death or confinement in the penitentiary for life or for any term of not less than two years."

Appellant testified, in part, as follows: "I did not have any intention of killing Mr. Stowe there that night. I did not intend to kill him at all. I have no recollection of his pulling me around and I did not, as far as I know, know anything. I do not remember anything about it. I do not remember firing any shots at Mr. Stowe and I had no intention to shoot him at any time."

Exception was leveled at the court's charge on murder on the ground that it failed to require the jury to believe beyond a reasonable doubt that the appellant had the specific intent to kill the deceased. Again, an instruction was sought advising the jury to acquit the appellant if they entertained a reasonable doubt as to whether he had the specific intent to kill the deceased. The exceptions were not well taken. We refer to the case of Kelley v. State, 112 S. W. (2d) 470, wherein it is shown that Kelley was intoxicated at the time he killed F. A. Lloyd, the sheriff of Lamb County. He had testified that he was drunk and remembered nothing about the homicide. In that case the court charged the provisions of Article 36, supra. Kelley requested a special charge which read as follows: "You are instructed, as part of the law in this case, that the jury may take into consideration the evidence before them as to the drunkenness of the defendant at the time of the shooting in question in determining whether the defendant had at the time the intent to commit the offense of murder, as that offense is defined in the charge of the court."

The conclusion that the above quoted charge was not called for was supported by the holding in Clinton v. State, 104 S. W.

(2d) 39. We quote from the opinion as follows: "Suffice it to say that we gather therefrom [referring to Clinton v. State, supra] that mere intoxication is never any defense to the commission of a crime, and can never be used as such, neither as to intent nor a question of guilt; however, if temporary insanity be induced by the use of ardent spirits, such can be shown, and if the jury sees proper, they could use such insanity only in mitigation of the penalty, but such mitigation is a matter to be determined by the jury only in their proper discretion. One can not defend on account of a lack of intent; the failure to have an intent being based on the fact of his intoxication by the use of ardent spirits. See Doyle v. State, 59 Texas Crim. Rep. 39, 43, 126 S. W. 1131, wherein Judge DAVIDSON held that under such circumstances it was only necessary for the court to charge on the law as laid down in the statute."

In his motion for new trial appellant alleged that the jury, after having retired to deliberate, were guilty of misconduct in receiving new testimony. Upon the hearing the twelve jurors were called to testify. From their testimony it appears that upon the first ballot two or three of the jurors voted against the infliction of the death penalty. The question then arose whether appellant was temporarily insane from the recent use of ardent spirits when he killed the deceased. Some of the jurors pointed to the fact that appellant had remembered where he dropped the pistol. It was their opinion that such fact militated against the conclusion that he had no recollection of the transaction resulting in the homicide. It appears further from the testimony that during their discussion all of the jurors were present. Juror Schmidt opposed the infliction of the death penalty during the time fourteen ballots were being taken. However, on the fifteenth ballot he agreed to the return of the verdict herein. Throughout the balloting there were changes in the attitude of the jurors, the testimony showing that on the first ballot ten stood for the death penalty, and that on subsequent ballots five of the jurors voted against infliction of such penalty. The juror Schmidt testified that four or five of the jurors referred to the fact that they had been drunk on several occasions and invariably remembered everything that occurred. Also he testified that he stated to the jurors that he had been drunk and did not recall what he did during the time he was intoxicated. One or two of the jurors testified that Schmidt's statement was to the effect that on some occasions when he was intoxicated he recalled what he had done, whereas on other occasions when in the same condition he had no recollection of what transpired. One of the jurors testified that practically all of the members

of the jury gave their personal experiences in relation to the use of intoxicating liquor, saying that they had been drunk on occasions and remembered the things they did. Four of the jurors testified that they at no time during the discussion gave their own personal experiences in the use of intoxicating liquor. Two jurors said that they heard other members of the jury refer to the fact that intoxication had not affected them to the extent that they were unable to recall what they did while under the influence of liquor. Three jurors testified that they heard no discussion of the matter whatever. Another said that he heard it discussed by only one member of the jury. Juror Rutledge testified that he heard Schmidt say that "he [Schmidt] had been so drunk that he had forgotten to go to bed and again that he had not forgotten." As to other jurors relating their experiences, the appellant's counsel asked Mr. Rutledge the following question: "Was it not said that they discussed it and the discussion arose and several of the jurors gave their experience and whether they did remember?" He answered "No, sir." Again he said: "To my knowledge it did not occur that other jurors said they had been drunk and could not recall what occurred."

Subdivision 7 of Article 753, C. C. P., provides that a new trial shall be granted in cases of felony where the jury, after having retired to deliberate upon a case, have received other testimony. Information given by one of the jurors to the others is new and other testimony within the meaning of the statute. Holland v. State, 298 S. W. 898, and authorities cited. The question whether the alleged misconduct of the jurors, if established by the uncontroverted testimony, would have warranted the granting of a new trial is not easy of solution. In 33 Corpus Juris 498 it is said: "Differences in individual susceptibilities to the influence of intoxicating liquor is a fact of common and judicial knowledge." In Frazer v. State, 268 S. W. 164, this Court said: "In determining what is proper and what is improper discussion among jurors, regard must be had for the fact that the jury are supposedly men of different walks of life, avocations, and necessarily views that would be affected by their past experiences and situations. They could hardly arrive at a solution of their differences without discussion of the facts before them, and each man's discussion would necessarily be tinged or affected by his own viewpoint and experiences."

In Jack v. State, 20 Texas Crim. App. 656, the Court used language as follows: "It seems to us that it would be a dangerous and exceedingly pernicious practice for the courts to permit

the sanctity of the juryroom to be invaded, and jurors to be interrogated as to the arguments used in their deliberations, and the influence of such arguments upon their minds, and the reasons and considerations upon which their verdicts were based. There might arise, perhaps, an extreme case in which such a practice would be tolerated to prevent flagrant wrong and injustice, but this Court would not be willing to sanction the procedure unless it should manifestly appear that the ends of justice imperatively demanded it. If it were permitted to attack and set aside a verdict because of arguments and reasons advanced and urged by jurors in their deliberations thereon, it would destroy free discussion and interchange of opinions among jurors. It would open the door to a searching inquiry in relation to every act and word which transpired in the juryroom, and would subject each individual juror to be placed upon trial before the court to answer for the soundness and propriety of the opinions expressed by him in the juryroom."

In the civil courts it appears to be the rule that statements of individual experiences of jurors constitute misconduct where such statements have some relation by analogy to some fact in issue. We quote from 46 A. L. R. 1510, as follows: "Passing the difficulty already alluded to of presenting the matter to the court, it may be stated as a general rule that the discussion or consideration in the juryroom of personal experiences of jurors is ground for a new trial. Although the statement of a juror which is alleged to constitute misconduct is not directly associated with any fact in issue, yet, if the consequence is to influence the judgment of other jurors in arriving at their verdict, then the substantial rights of the party whose cause is unfavorably affected by the statement are disregarded, and a new trial should be awarded."

See St. Louis Southwestern Ry. Co. of Texas v. Robinson, 285 S. W. 269.

We deem it unnecessary to decide whether the alleged conduct, if established by the uncontroverted evidence, would warrant a new trial if the rule prevailing in the civil courts should be given effect. In this connection, however, it is observed that as it is a matter of common knowledge that there is a difference in individual susceptibilities to the influence of intoxicating liquor, we might hesitate to hold that the jury received new and other testimony within the purview of Article 753, supra. In any event, it is unnecessary to determine at this time whether the announcement of the civil courts should receive our approval. Our analysis of the testimony adduced upon the motion

for new trial leads us to the conclusion that the trial court was warranted in finding that the juror Schmidt alone related his experience in relation to intoxication, and that in his statement to the other jurors relative to the matter he asserted that at times while drunk he remembered everything he did, while at other times, when in the same condition, there was an absence of recollection. We say this in view of the testimony of one of the jurors to the effect that Schmidt was the only man on the jury who related his personal experience in this regard, and also in view of the testimony of other jurors that they only heard one juror advert to such matter. Obviously the statement of the juror Schmidt, if to be taken as new testimony, was not calculated to influence the judgment of the other jurors in arriving at their verdict. Further, in view of the fact that the testimony was to the effect that the jurors were together during the discussion and several of the jurors testified that they heard no relation of personal experiences on part of members of the jury, the trial court might have reached the conclusion that the alleged misconduct did not in fact occur.

In Branch's Ann. P. C., Section 573, it is said: "Where the alleged misconduct was made the subject of diligent investigation by and under the direction of the trial judge and settled in behalf of the State upon conflicting evidence, the decision of the judge will be given as much consideration on appeal as would be given to the verdict of the jury on any other question of fact, and if there is sufficient evidence to justify the action of the trial judge his decision thereon will not be disturbed on appeal unless clearly wrong." In support of the text many authorities are cited, among them being Shaw v. State, 22 S. W. 588; Fox v. State, 109 S. W. 370, and Allen v. State, 138 S. W. 593. Stated in another way, it is the rule that the settlement of the conflict in the testimony adduced on motion for new trial is for the trial judge, and that the granting of a new trial for misconduct of the jury is largely in his discretion. In the absence of abuse of such discretion action in refusing a new trial will not be disturbed on appeal. Johnson v. State, 40 S. W. (2d) 111. The opinion is expressed that an abuse of discretion is not shown. Russell v. State, 6 S. W. (2d) 760; Williams v. State, 279 S. W. 462.

Further, it was alleged in the motion for new trial, in effect, that the juror Schmidt was intimidated into assenting to the verdict assessing the death penalty by the charge brought against him by other jurors that he had been put upon the jury for the purpose of preventing the assessment of the extreme penalty. There appears to have been a conflict in the testimony

on this question. Be that as it may, it was expressly held by this Court in Montgomery v. State, 13 Texas Crim. App. 74, that a juror may not be allowed to impeach his verdict by showing that his consent resulted from a charge by other jurors that he had been put on the jury for the purpose of hanging it. We desire to say that there is nothing in this record which would have warranted any member of the jury in making the charge in question. On the contrary, the testimony adduced on the motion for new trial conclusively shows that neither appellant nor his counsel had in any manner tampered with the juror, and further shows that he was not placed upon the jury for any ulterior purpose. Also it is proper to say that the juror Schmidt testified the insinuations and statements by some of the jurors that he was a "sinker" had no influence on his verdict.

After a careful examination of the appellant's contentions we are constrained to hold that reversible error is not presented.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—In view of appellant's motion we have reviewed the testimony given by the jurors upon the claim of misconduct. This evidence was analyzed as best we could do so in our original opinion. A further discussion of the subject would be a mere restatement of the substance of the evidence of the various jurors, which would serve no useful purpose. In view of the extreme penalty it has been our effort to give the question closest scrutiny.

Under the record it is still our opinion that we would not be justified in interfering with the conviction.

The motion for rehearing is overruled.